UNITED STATES of America, Appellee,

v.

Nicholas R. MARINO,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Peter R. CHABOT,
Defendant, Appellant.

Nos. 90–1920, 90–1953.

United States Court of Appeals,
First Circuit.

Heard April 1, 1991.

Decided June 18, 1991.

Samuel A. Olevson, Providence, R.I., for defendant, appellant Nicholas R. Marino.

Jane Climenko Gottschalk, Cambridge, Mass., for defendant, appellant Peter R. Chabot.

Margaret E. Curran, Asst. U.S. Atty., with whom Lincoln C. Almond, U.S. Atty., and James H. Leavey, Asst. U.S. Atty., were on brief, Providence, R.I., for the U.S.

Before CAMPBELL, SELYA and CYR, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

After a "reverse sting" operation in Rhode Island in December 1989, Nicholas R. Marino and Peter Chabot were indicted for drug trafficking offenses. In Count I, Marino, Chabot, and two codefendants not involved in this appeal (David Zielinski and David Esten), were charged with conspiracy to distribute and possess with intent to distribute 1,000 kilograms or more of marijuana, in violation of 21 U.S.C. § 846. In Count II, Chabot was charged (along with Zielinski and Esten), with attempt to possess with intent to distribute 1,000 kilograms or more of marijuana, in violation of 21 U.S.C. § 841. In Count III, Marino alone was charged with attempt to possess with intent to distribute 100 kilograms or more of marijuana, in violation of 21 U.S.C. § 841.

Chabot pleaded guilty to Counts I and II and his pleas were accepted. Prior to sentencing, however, Chabot moved to withdraw his guilty pleas. Marino pleaded guilty to Count III of the indictment, which had been amended to delete all references to the quantity of marijuana involved.[1] In return for Marino's plea, the government agreed to dismiss Count I of the indictment against him at the time of sentencing.

A presentence evidentiary hearing was held on July 13, 1990, regarding both Chabot's motion to withdraw his plea and the quantity of marijuana Marino had sought to purchase. After this hearing, the district court denied Chabot's motion to withdraw his plea. The court also found, for purposes of sentencing, that Marino had attempted to procure more than 100 kilograms of marijuana.

At sentencing, Chabot's base offense level was calculated to be 34. The district court granted Chabot a two-level downward adjustment for acceptance of responsibility, but readjusted upward two levels, finding that Chabot had obstructed justice at the July 13 hearing by falsely denying involvement in the conspiracy. Chabot was sentenced to 165 months imprisonment.

Marino's base offense level was calculated to be 26. The court added a two-level upward adjustment for obstruction of justice, finding that Marino had prevaricated at the presentence evidentiary hearing and

---

1. While the government claimed that Marino was attempting to buy over 100 kilograms of marijuana with intent to distribute, Marino insisted he meant to purchase only one pound with intent to distribute. The court permitted the deletion as the amount of drugs was seen as a question for the court at sentencing. *United States v. Barnes*, 890 F.2d 545, 551 at n. 6 (1st Cir.1989).

in the statement of acceptance of responsibility when he said that he had only sought to purchase one pound of marijuana. The court refused to allow a two-level downward adjustment for acceptance of responsibility. It also denied Marino's request for a downward departure based on his military record in Vietnam. Marino was sentenced to 82 months imprisonment.

On appeal, Chabot contends that the district court erred in, (1) denying his motion to withdraw his guilty plea, in which he contended that the government's conduct in the "sting" operation was so outrageous as to deny him due process of law; and (2) increasing Chabot's offense level for obstruction of justice. Marino argues on appeal that the district court erred in, (1) determining that he attempted to possess more than one pound of marijuana; (2) adjusting his offense level upward for obstruction of justice; (3) refusing to grant a downward adjustment for acceptance of responsibility; (4) refusing to grant a downward departure on account of Marino's military record.

We affirm the convictions and the sentences of both Chabot and Marino.

### Background

The drug trafficking scheme at issue was rooted in a Polk County, Florida Sheriff's Department undercover investigation entitled "Operation Corinthian." At the July 13, 1990 evidentiary hearing, Ennis Hornsby, Polk County, Florida Deputy Sheriff, testified extensively. Also testifying were Chabot, Marino, and their codefendant, David Zielinski.

Hornsby explained that the Polk County sheriffs imported 5,900 pounds of Colombian marijuana and acted as a storage and transportation facility for certain Colombians. The Colombians, having arranged the purchase and negotiated a price, would send their customers to the undercover sheriffs to exchange the money for the marijuana. On November 16, 1989, the sheriffs delivered 18 bales (1,000–1,100 pounds) of marijuana to Chabot and another individual, and received payment of $84,990 for the storage and transportation of the marijuana.

To avoid compromising the undercover operation, the Florida authorities did not arrest Chabot and his accomplice immediately after they left the warehouse with the marijuana. Instead, the authorities waited until the buyers drove off in Chabot's truck, and then staged an intentional collision with the truck. This enabled officers investigating the accident to "discover" the marijuana, and arrest and charge Chabot and his accomplice, without leading the latter to suspect that their prior purchase of the drug was from undercover agents. Barry Walton, according to Sheriff Hornsby an undercover "associate" (presumably an informant) with the Polk County Sheriff's Department, posted bail for Chabot. Chabot then recontacted the undercover sheriffs to arrange a subsequent purchase of 4,000 pounds of marijuana for delivery in Rhode Island. Sheriff Hornsby testified that Chabot left a 1966 Corvette as collateral for this, second, marijuana deal.

Hornsby testified that the Polk County Sheriff's Department then contacted the Drug Enforcement Administration (DEA) in Providence, Rhode Island, and that arrangements were made to fly the 4,000 pounds of marijuana from Florida to Rhode Island. Hornsby and another sheriff ("Captain Cross," referred to under cover as "Sam"), now working with the DEA, met to consummate the transaction on December 18 and 19, 1989, with Chabot, codefendant David Zielinski and, briefly, Marino, at a Howard Johnson's motel in Warwick, Rhode Island. These meetings were videotaped.

At the taped first December 18 meeting, Chabot told Hornsby (referred to under cover as "J.W."), that he had $78,000 in his friend's truck, and needed 50 pounds of marijuana to show his customers, and would then do two deals of 500 pounds and two deals of 1,000 pounds.[2] He said he

---

2. Chabot said: "I'm gonna go show every big shot today, tonight, get the orders. If we can do

a 500, a 500, a thousand and a thousand, you're outta here."

would pay $70,000 but needed $5,000 for his lawyer in Florida, and $3,000 to "maneuver." Chabot also stated: "Nick Marino's buying, Whitey Boger's buying, and I'm taking care of the rest." Hornsby arranged that Chabot would show the marijuana to his customers at the Howard Johnson's room.

At the taped second December 18 meeting, Chabot brought Zielinski, who inspected the marijuana. Zielinski said he had $80,000 sitting in his van, and said: "I have one guy that will take 500, it's only down the road, 20 minutes, 15 minutes, that's a 500, if he likes it, but I have to show him something."[3] Zielinski said he would call his friend to inspect a bale of the marijuana at the Howard Johnson's. In the third December 18 meeting shortly thereafter, Zielinski was followed into the room by Marino. On the videotape of this third meeting, Marino picked up the bale of marijuana and went out of sight of the camera. At the July 13 hearing, Hornsby testified:

> [Marino] walked over to the bed, picked [the bale] up, there was not enough light there so he moved it over to the table where there was a lamp, and after he got over he opened it up, looked inside and said, the only thing he said while he was in the room was "Good" and out the door he went.

Zielinski also testified at the July 13 hearing that Marino said in the room, "I like the way it's packaged."

In the third meeting the following day, December 19, Zielinski brought $70,000 cash to the motel room in which the undercover agents and Chabot were present. The $70,000 was to be a security deposit for ten bales, or approximately 500 pounds, of marijuana. At this time, Chabot, Zielin-

ski, and their driver, David Esten, were arrested. Marino was later arrested at his home.

## I.

◼ Chabot contends that the district court should have permitted him to withdraw his guilty plea. Fed.R.Crim.P. 32(d) provides that the court may permit the withdrawal of a plea prior to sentencing "upon a showing by the defendant of any fair and just reason." We will set aside the district court's findings as to whether or not a sufficient showing was made only where the "defendant unequivocally shows an abuse of discretion." *United States v. Ramos*, 810 F.2d 308, 311 (1st Cir.1987); *see also United States v. Allard*, 926 F.2d 1237, 1243–44 (1st Cir.1991). We find no abuse of discretion here.

Chabot urges that he should have been allowed to withdraw his guilty plea as the government's conduct in the course of its "sting" operation was "outrageous." Chabot contends he was unaware of this "outrageous" conduct at the time he entered his plea. The conduct about which Chabot complains was that of the Polk County Sheriff's Department in Florida.

Chabot points out that the Sheriff's Department improperly staged a collision after Chabot purchased marijuana from undercover sheriffs in Florida. He asserts that the Department subsequently filed an incident report and an affidavit, neither of which specify how Chabot's vehicle was stopped or disclose that the accident was deliberately staged. Chabot also alleges that Barry Walton, in association with the Sheriff's Department, bailed him out of jail in the Florida case, in violation of his due process rights.[4]

---

**3.** Zielinski reiterated throughout the meeting: "One guy wants 500 right now cash.";
"I have a guy that wants to buy (inaudible).";
"Okay, I have a guy that will come real close to here, but do you want someone to come in, how we gonna do this for 500?";
"You see I can go right around the corner, the guy that does 500, he's right here. We do the 500, we're in good shape, he's right here, if he likes these, which he should—";
"Listen, this is what I'm gonna do. One of my guys (inaudible) should take it. The one with

the 500 down the road. If he don't like it, like I say I got 2,000 sold to another guy, 500, 700, 200, a thousand, that's how it's going. We'll let the thousand guy come here."

**4.** Chabot also asserts that there were "inconsistencies" in the record regarding the money paid to the Florida sheriffs in the initial Florida marijuana transaction, and regarding cars Chabot gave to Barry and the undercover sheriffs. Chabot does not maintain that such "inconsistencies" are part of his claim that the Florida

Whatever the propriety of the Florida sheriffs' conduct, it bore only a remote relationship to the present charges, all of which arose from Chabot's subsequent dealings in Rhode Island. To be sure, by staging the collision and bailing Chabot out of jail, the Florida sheriffs maintained the fiction that they were authentic crooks, thereby encouraging Chabot to recontact them to arrange a second deal. Had they not hid their true identity, or had they kept him locked up in Florida, he would have lost the opportunity to commit the present offenses. But the sheriffs' devious maneuvers did not force Chabot to commit the offenses in Rhode Island to which he pleaded guilty. Chabot initiated the Rhode Island marijuana deal on his own. As Chabot concedes, no entrapment defense is available. *See Hampton v. United States,* 425 U.S. 484, 489–90, 96 S.Ct. 1646, 1649–50, 48 L.Ed.2d 113 (1976). We recently stated in rejecting a claim of outrageous government conduct in a narcotics sting operation,

In the ongoing struggle between law enforcers and the underworld, the use of ingenuity is not foreclosed to the government. The police may, within reason, employ guile and clever tactics. When investigating narcotics enterprises, such stratagems are frequently the option of choice; by their very nature, drug rings are extremely difficult to penetrate and detect without undercover intrusion. Not surprisingly, then, courts have consistently recognized that greater government involvement is allowable in such cases.

*United States v. Panitz,* 907 F.2d 1267, 1273 (1st Cir.1990). While police involve-

ment could be so outrageous as to violate a defendant's due process rights even where the defendant was predisposed to commit the crime, this is not such a case. *See id.* at 492–93, 96 S.Ct. at 1651–52; *United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1641–43, 36 L.Ed.2d 366 (1973); *United States v. McDowell,* 918 F.2d 1004, 1008–09 (1st Cir.1990); *United States v. Rodriguez–Ramos,* 704 F.2d 17 (1st Cir.), *cert. denied,* 463 U.S. 1209, 103 S.Ct. 3542, 77 L.Ed.2d 1391 (1983); *United States v. Johnson,* 565 F.2d 179, 181 (1st Cir.1977), *cert. denied,* 434 U.S. 1075, 98 S.Ct. 1264, 55 L.Ed.2d 780 (1978). The district court did not abuse its discretion in denying Chabot's motion to withdraw his plea.

## II.

While Marino pleaded guilty to attempting to possess with intent to distribute marijuana, he has maintained that he sought to purchase only one pound of marijuana when he came to the Howard Johnson's with Zielinski, and never attempted to purchase more.[5] The district court found, however, in keeping with the government's original charge, that Marino attempted to purchase more than 100 kilograms of marijuana.[6] The government need only prove the facts supporting sentencing, such as the quantity of marijuana Marino attempted to purchase, by a preponderance of the evidence. *United States v. Aymelek,* 926 F.2d 64, 67 (1st Cir.1991); *United States v. Wilkinson,* 926 F.2d 22, 28 (1st Cir.1991) (citing *United States v. Wright,* 873 F.2d 437, 441 (1st Cir.1989)); *United States v. Hilton,* 894 F.2d 485, 487 (1st Cir.1990). We review the district court's findings of fact only for clear error. *Aymelek,* 926

authorities denied him due process of law; he only contends they "raise questions about the amount of property which may be in the possession of the government and how the government may have disposed of that property." We do not find any basis in these contentions for requiring that the district court allow Chabot to withdraw his plea in this case.

**5.** One kilogram equals approximately 2.2 pounds.

**6.** The district court stated, at the close of the July 13 hearing:

I'm satisfied that with respect to Count 3 that indeed [Marino] was involved in a transaction which involved more than 100 kilograms of a substance containing a detectable amount of marijuana, that is, 500 pounds, that the deal was, and as the tape demonstrated, it was going to be 500 pounds at a time or maybe 1,000 pounds at a time until we got to the ultimate amount. So that I'm satisfied with respect to the third count that there was more than 100 kilos that Mr. Marino was involved with.

F.2d at 68; *United States v. Akitoye*, 923 F.2d 221, 227 (1st Cir.1991). We find no clear error in this case.

First, Marino asserts that there was no evidence he was financially capable of purchasing 100 kilograms or more of marijuana. Without getting into the question of whether there was a need for proof of financial capacity, the fact remains there was evidence at the July 13 hearing from which the court could infer that Marino would be financially capable of purchasing more than 100 kilograms of marijuana. *See United States v. Bradley*, 917 F.2d 601, 604–05 (1st Cir.1990). At the time of his arrest, $7,500 was recovered from Marino's house. Marino testified that he was receiving disability payments of $1,600 per month, and nevertheless made a $40,000 down payment on a $100,000 piece of property in Maine. Chabot said on the videotape of the meeting on December 19 that Marino has been dealing for 22 years, that Chabot had seen him lose $287,000, and that "[Marino's] got 500,000." Zielinski testified at the July 13 hearing that Chabot owed Marino $60,000 [7] in connection with a deal for thirty kilograms of cocaine, where Marino purchased the cocaine in Florida for $24,000 per kilogram and resold to Chabot and Zielinski for $32,000 per kilogram. Zielinski also testified that he had been involved in too many drug deals with Marino to count them. Finally, Zielinski testified that in November 1989 he discussed the possible shipment of 1,000 to 1,500 pounds of marijuana with Marino, who told Zielinski that he could purchase the entire amount. In addition, a radio frequency detector and a .25 caliber loaded semiautomatic pistol with an ankle holster were recovered from Marino's home after his arrest. (Marino testified at the July 13 hearing that he purchased these items at a flea market.) All of this evidence gives rise to a reasonable inference that Marino dealt in drugs on a significant scale, and was financially capable of purchasing a large amount of marijuana.

Second, contrary to Marino's contentions, the record supports the court's conclusion that he attempted to buy more than 100 kilograms, rather than just a pound of marijuana. Marino emphasizes statements of Chabot and Zielinski on the videotape of the December 19 meetings, as well as testimony at the July 13 hearing, suggesting that the deal with Marino might fall through. On the videotape, Chabot expressed dissatisfaction with Marino's price demands, and both Chabot and Zielinski were uncertain when Marino might contact them. At the hearing, Zielinski testified that he and Chabot were uncertain whether the deal with Marino would take place.

Zielinski, however, testified extensively about his arrangements with Marino to buy the marijuana. Zielinski said that he met with Marino the week prior to December 19, 1989, at which time Marino gave him $80,000 at Marino's home as a deposit to ensure that the deal would take place. Zielinski testified that, under his agreement with Marino, Marino would get first choice to purchase marijuana, and that Marino would also get $50 per pound out of the profits from anything Zielinski sold in order to offset the $60,000 debt to Marino. On cross-examination, Zielinski testified that he agreed with Marino that the $80,000 was to be used to buy "two bales of pot, one that [Marino] was going to take and show and one that I was going to take and show." Zielinski testified that he used the money from Marino to give $70,000 to the undercover agents on December 19. Zielinski also testified that Marino told him he wanted to purchase 500 pounds of marijuana to start, and would want an additional 300 pounds two to three hours thereafter. Finally, Zielinski testified that he met Marino at the Howard Johnson's on

---

**7.** Zielinski first testified that he owed Marino the $60,000 and then changed his mind. The testimony was as follows:

> Q. Did you owe Mr. Marino any money?
> A. Yes, basically I owed Mr. Marino $60,000 because of a bad deal.
> Q. You say you owed it?

> A. Well, actually it was Mr. Chabot, Peter Chabot.
> Q. Were you working with Mr. Chabot in that bad deal?
> A. I was more or less responsible for it and it went sour.

Monday, December 18, in order that Marino could inspect the marijuana he was purchasing, and that after inspecting the marijuana, "[h]e was a little bit unsure but he indicated to me that he still wanted the 300 but he no longer wanted the 500 because he was working on something Thursday." Also, Chabot, at the outset of the December 19 meeting, told the undercover sheriff that Marino had another shipment arriving "Thursday," but would take 400 pounds for someone else.[8]

We conclude that the district court did not commit clear error in finding that, by a preponderance of the evidence, Marino attempted to purchase a quantity of more than 100 kilograms of marijuana. While there was some evidence suggesting that Zielinski and Chabot were unsure of Marino's intentions on December 19, and at the hearing Chabot characterized his statements on the videotaped meetings as exaggerated puffery, credibility determinations are normally within the province of the sentencing judge. *See Bradley*, 917 F.2d at 605. At the time of their arrest, Chabot and Zielinski were accepting 500 pounds of marijuana in exchange for $70,000 of what Zielinski testified was Marino's money. Even at the December 19 meeting, Chabot still said that Marino was to buy 400 pounds. While the record is somewhat unclear whether Marino was ultimately to buy 300, 400, or 500 pounds, the court's finding that the quantity in any event was more than 100 kilograms was amply supported in the record.[9]

## III.

Both Chabot and Marino challenge the district court's imposition of a two-point enhancement to each of their base offense levels on account of their purported false testimony at the July 13 hearing and in Marino's written statement of acceptance of responsibility. The Sentencing Guidelines, § 3C1.1, provide that a two-level increase should be imposed,

> "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense...."

Application Note 3 provides as examples of conduct meriting the adjustment, *inter alia*, perjury and providing materially false information to a judge. While Application Note 1 indicates that the section is not intended to punish exercise of a constitutional right or denial of guilt, the note explicitly clarifies that perjurious denial of guilt under oath is not so excluded. There is no constitutional right to commit perjury. *See United States v. Grayson*, 438 U.S. 41,

---

**8.** Chabot said:

> I just went to seek Nick, he was playing fuck fuck, but he'll probably want them like at three or four. I'll do 'em right now, I might need an extra couple of hours. I got the 70 with me. He tough to do business with, he's got a guy, he says he's got something coming in Thursday, but he's probably bullshitting us. He said he's got a guy, if he likes 'em, he'll take 400. David [Zielinski] told him fuck you, we'll go do 2,000 with a guy and do you last, you know, but he'll call by tomorrow, or this aft, but there's no problem, I got the 70, the sooner we get going the better, we're not getting anywhere, you know, the sooner the better....

**9.** Marino contends that the district court found that he attempted to purchase 500 pounds of marijuana, and that the most he could have been found to have wanted was 300 pounds. Marino's base offense level of 26, with a sentencing range of 78–97 months, was applicable for quantities of 100–400 kilograms. Nevertheless, Marino contends that the difference is significant because the district court selected a

tentative sentence of 87 months, because, as the court stated, "the quantity involved here is in the mid-range...." (The district court then took into consideration Marino's military service and lack of a prior criminal record to impose a sentence of 82 months.) Marino contends that, had the district court found only 300 pounds, it would have imposed a sentence at the very bottom of the range.

First, we disagree that the district court found that Marino attempted to purchase precisely 500 pounds of marijuana. The court only referred to precise amounts "until we got to the ultimate amount." *See supra* note 6. Further, we think that the district court could have found, by a preponderance of the evidence, at least 400 pounds based on Chabot's videotaped statement at the December 19 meeting. *See supra*. The district court, without finding a precise amount, did not commit clear error in finding that Marino attempted to purchase an amount in the "mid-range" between 100 and 400 kilograms of marijuana.

54, 98 S.Ct. 2610, 2617–18, 57 L.Ed.2d 582 (1978); *United States v. Batista–Polanco*, 927 F.2d 14, 21–22 (1st Cir.1991); *see also Akitoye*, 923 F.2d at 228.

We review for clear error the district court's findings that, by a preponderance of the evidence, Chabot and Marino testified falsely at the July 13 hearing. *See Aymelek*, 926 F.2d at 67–68; *Akitoye*, 923 F.2d at 229. We also bear in mind that Application Note 1 to § 3C1.1 directs that the defendant's testimony should be evaluated in a light most favorable to the defendant, but do not interpret this to require that the district court must resolve evidentiary conflicts in the defendant's favor. We have previously interpreted this note as follows:

> [T]his note suggests to us that, if perjury is less than apparent on the record as a whole, with due respect for the trial judge's coign of vantage and allowing reasonable latitude for credibility assessments, the defendant should be given the benefit of the resultant doubt.

*Aymelek*, 926 F.2d at 68. *See also United States v. Wallace*, 904 F.2d 603, 605 (11th Cir.1990); *United States v. Franco–Torres*, 869 F.2d 797, 800 (5th Cir.1989). We hold here that the district court's findings were not clearly erroneous.

■ The district court found that Chabot testified falsely, first, in denying at the July 13 hearing that he was involved in a transaction to purchase and distribute 4,000 pounds of marijuana, and second, in his testimony regarding the $60,000 debt to Marino. Chabot pleaded guilty to attempting to possess with intent to distribute 1,000 kilograms or more of marijuana and conspiracy to do the same on March 28, 1990, and confirmed that he understood these charges and his acknowledgement of guilt. At the July 13 hearing, Chabot unequivocally denied that he conspired to knowingly and intentionally distribute and possess with intent to distribute 1,000 kilograms of marijuana. Moreover, at the July

13 hearing, Chabot confirmed that in his initial motion to withdraw his plea, he contended that he was not involved in a conspiracy involving 1,000 kilograms or more of marijuana. The evidence of Chabot's involvement in the conspiracy was overwhelming. The district court was clearly entitled to find, by a preponderance of the evidence, that Chabot testified falsely in this regard.

In addition, Chabot first conceded, consistent with Zielinski's testimony, that he owed Marino $60,000. He then asserted his Fifth Amendment privilege against self-incrimination and refused to explain the circumstances of the debt. Later, on cross-examination by counsel for Marino, Chabot denied that he ever owed Marino $60,000. The court concluded that Chabot was "not exactly forthcoming" when asked about the $60,000, and was entitled to find, by a preponderance of the evidence, that Chabot gave false testimony regarding this issue as well. Chabot contends on appeal that this testimony was immaterial to this case. In fact, Zielinski testified that Marino was to receive a portion of the profits on all of the marijuana which Zielinski sold in order to repay the $60,000 debt. The debt was therefore material to the arrangements and purposes of the marijuana conspiracy, and Marino's role in it.

■ In Marino's case, the district court found that Marino testified falsely in claiming that he only attempted to buy one pound of marijuana and in providing the same false information in his written statement of acceptance of responsibility reproduced in the presentence report. Marino testified at the July 13 hearing that he went to the Howard Johnson's on December 18, 1989 "to buy a pound of pot." He testified he did not know why Chabot stated at the videotaped meetings that Marino was there to buy 300–500 pounds of marijuana,[10] and denied that he gave Zielinski $80,000 or that he gave Zielinski $60,000.

---

10. Marino's testimony was as follows:

   Q. You heard Mr. Chabot state that you were there to purchase varying degrees, 300 to 500 pounds of marijuana, is that correct, you heard the statement?

   A. Yes.

   Q. Do you know why Mr. Chabot would say that?

   A. I don't know. Maybe Mr. Chabot's covering up for somebody.

Also, in Marino's statement of acceptance of responsibility, he stated that he only sought a pound of marijuana and was interested in nothing more.[11] As discussed above, the district court could properly have found that Marino attempted to purchase more than 100 kilograms of marijuana, and *a fortiori*, was entitled to find, by a preponderance of the evidence, that Marino testified falsely in this regard.

Marino emphasizes on appeal that the district court stated at the September 7, 1990 sentencing hearing: "The defendant has testified that he was at Howard Johnson's Motel on December 18, 1989; with (sic) attempting to purchase one pound of marijuana for his personal use...." Marino asserts he never testified the pound was for personal use, and that the district court's findings were thus clearly erroneous. We do not find the district court's reference significant. The district court made clear immediately thereafter that the enhancement was based on Marino's contentions as to *amount* rather than *use*. The court stated:

> I must say it defies one's imagination to expect people to believe that somebody is going to inspect a 500 pound bale, or a 40

pound bale I guess it was, for the purpose of buying one pound.... I frankly can't accept the suggestion that Mr. Marion's (sic) interest was in one pound of marijuana.

Also, Marino's counsel had just previously suggested that there was some indication Marino wanted the marijuana for personal use. In any event, the inconsistency between Marino's testimony as to the amount sought and the substantial government evidence of his attempt to purchase a much larger amount is sufficient to support the district court's enhancement. *See Akitoye*, 923 F.2d at 229 (where district court did not specifically identify segments of defendant's testimony it found to be false, omission does not preclude affirmance of false testimony finding where "the record speaks eloquently for itself"); *United States v. Bianco*, 922 F.2d 910, 914 n. 4 (1st Cir.1991); *Wallace*, 904 F.2d at 605 (where district court did not specifically identify false testimony supporting enhancement, court of appeals affirmed § 3C1.1 enhancement on basis of internal contradictions and substantial inconsistencies between defendant's testimony and government's evidence in the record).[12]

---

11. Portions of Marino's statement, as reproduced in the pre-sentence report, were as follows:

> David [Zielinski] whispered to me as he was leaving [the restaurant] that he and a few friends were going to be getting some good pot. He asked me if I would be interested and I told him I would take a pound.... On December 18 at about 5:00 PM he called and asked me to meet him at Howard Johnson's on Jefferson Blvd. I assumed he would have my pound, so I met him there about 6:30.
>
> Right away, he wanted to know if I knew anybody who would be interested in buying 500 pounds. I asked him if he was crazy; who has that kind of money? ...
>
> The next morning he called me and asked me to meet him at the Showcase Cinema in Warwick. I thought he would have my pound with him, so I did meet him about 10:00 AM. He said he could not get me a pound, that the guys he was with would not sell single pounds. I told him that all I wanted was a pound and he should not have made me come all the way to Showcase to tell me he wasn't going to do it.

12. Marino also argues that the district court quoted a portion of the pre-sentence report at

the sentencing hearing regarding Zielinski's testimony, without finding whether the information quoted was true. However, Marino did not object to these facts in the pre-sentence report at the sentencing hearing, and the district court was therefore entitled to accept them as true. *See United States v. Fox*, 889 F.2d 357, 359 (1st Cir.1989). Further, Zielinski testified to all of these facts at the July 13 hearing other than the assertion that Marino told Zielinski he had $400,000 to buy the 500 pounds of marijuana. As to this, Chabot stated at the videotaped meeting on December 19 that Marino had $500,000 to purchase the marijuana.

Marino also makes the following arguments which we find to be without merit. Marino argues, contrary to U.S.S.G. § 3C1.1 Application Note 3, that false testimony alone is not obstruction of justice. Marino also argues that his testimony that he sought to purchase one pound of marijuana when he went to the Howard Johnson's was consistent with the district court's finding that he attempted to purchase more marijuana. Since the district court did not find at what time Marino attempted the larger purchase, he argues, the larger attempted purchase could have been separate conduct from the acknowledged attempt to buy one

## IV.

■ Marino next contends that he was entitled to a two-point reduction in his offense level pursuant to U.S.S.G. § 3E1.1 for acceptance of responsibility. Section 3E1.1 entitles a defendant to the reduction if the defendant "clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct...." However, subsection (c) explicitly provides that a defendant who enters a guilty plea is not entitled to the reduction as a matter of right. Application Note 4 provides that, absent "extraordinary circumstances," conduct resulting in an enhancement under U.S.S.G. § 3C1.1 for obstruction of justice ordinarily indicates that the defendant has not accepted responsibility. Here, the district court refused to grant the adjustment for acceptance of responsibility because, contrary to Marino's testimony at the July 13 hearing and his statement of acceptance of responsibility, the court was convinced that Marino attempted to buy more than a pound of marijuana. We find no extraordinary circumstances here that would require the district court to grant a downward adjustment for acceptance of responsibility.

## V.

■ Marino finally maintains that he was entitled to a downward departure on the basis of his military service record in the United States Marine Corps. After the district court calculated a tentative 87 month sentence in the middle of the 78–97 months guideline sentencing range based on the amount of marijuana it found Marino attempted to purchase, the court, in recognition of Marino's military service, imposed a sentence of 82 months. The court concluded that Marino's military service constituted a contribution to society at some time in the past "in the usual circumstances." As such, the court concluded, pursuant to the U.S.S.G. 5K2.0 policy statement and 18 U.S.C. § 3553(b), that the military service was not "an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines," and therefore refused to depart downward on that basis. We are without jurisdiction in these circumstances to review the district court's decision not to depart from the guidelines sentencing range. *United States v. Porter*, 924 F.2d 395, 399 (1st Cir.1991); *United States v. Sanchez*, 917 F.2d 607, 613 (1st Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1625, 113 L.Ed.2d 722 (1991).

*Affirmed.*

---

pound. However, the district court could very reasonably have found that Marino's testimony that he sought only one pound—in conjunction with his testimony that he could not explain why Chabot would think Marino intended to buy more—and his written statement, *supra* note 8, that he never was interested in more than a pound, were inconsistent with the evidence that Marino sought to purchase more, and were perjurious.

Finally, Marino argues that the district court failed to expressly find that he committed perjury. We decline to accord the word "perjury" talismanic significance, and find it evident that the district court found Marino to have testified falsely regarding the amount of marijuana he sought to purchase.