UNITED STATES, Appellee,

v.

Nancy Esperanza MATIZ,
Defendant, Appellant.

No. 92–1534.

United States Court of Appeals,
First Circuit.

Heard Oct. 4, 1993.

Decided Jan. 4, 1994.

Theodore L. Craft, Boston, MA, by Appointment of the Court, for defendant, appellant Nancy Esperanza Matiz.

Geoffrey E. Hobart, Asst. U.S. Atty., with whom A. John Pappalardo, U.S. Atty., and Jeffrey A. Locke, Asst. U.S. Atty., Boston, MA, were on brief for appellee.

Before BREYER, Chief Judge, ROSENN,* Senior Circuit Judge, and CYR, Circuit Judge.

ROSENN, Senior Circuit Judge.

Appellant Nancy Esperanza Matiz was tried to a jury and convicted in the United States District Court for the District of Massachusetts for conspiracy to possess with intent to distribute five or more kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Matiz appeals her conviction and argues that: (1) the evidence introduced against her was insufficient to support the guilty verdict returned by the jury, (2) her conviction should be reversed on the grounds that the Government's conduct was outrageous, and (3) the district court erred in enhancing her sentence for obstruction of justice pursuant to § 3C1.1 of the United States Sentencing Guidelines. We affirm.[1]

## I.

This case arose out of a large scale investigation conducted by various government

---

* Of the Third Circuit, sitting by designation.

1. The district court possessed subject matter jurisdiction pursuant to 18 U.S.C. § 3231. This court has jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a)(2).

agencies in the United States and Colombia, South America into the cocaine distribution activities of a number of individuals. The United States Government (the Government) had the assistance of Pedro Alvarez, a defendant in another criminal matter.

Alvarez, at the behest of the Government, posed as a purchaser and contacted a number of cocaine suppliers in Colombia. Negotiations ensued over several months pertaining to the purchase of large quantities of cocaine. In the early part of 1991, the suppliers in Colombia informed Alvarez that they were experiencing temporary difficulties in smuggling the cocaine into the United States. In light of these difficulties, they asked Alvarez to assist them in transporting the shipment. Additionally, the suppliers asked Alvarez to store and distribute the cocaine to their associates.

The Government told Alvarez to request an up-front payment of $30,000 for his troubles and expenses. Reluctantly, the suppliers agreed and informed Alvarez that the payment would be made by one of their New York based associates, "La Negra," a code name for Matiz. The suppliers gave Alvarez "La Negra's" beeper number and code phrase for communication with her.

Alvarez and Matiz ultimately scheduled a meeting for May 23, 1991, for Matiz to hand over the money to an associate of Alvarez, actually Special Agent Dominick Lopez, at a Burger King restaurant in Queens, New York. At the scheduled hour, Matiz, along with an associate named Diaz, drove to the meeting place in a Nissan Pathfinder. After Lopez entered the vehicle, Matiz instructed Diaz to get the money. Diaz retrieved the money from under the seat of the automobile and passed it to Matiz who then gave it to Lopez. The sum, however, amounted to only $20,000 and Matiz promised to make an additional payment of $5,000 the next day, explaining that she had been told that the amount due was $25,000.

After this exchange, Matiz remained in close contact with Alvarez. She informed him that she was personally expecting to receive a large portion of the cocaine shipment upon its arrival. The suppliers in Colombia confirmed this information both in conversations with Alvarez and in facsimile messages sent to him. The shipment consisting of 615 kilograms of cocaine finally arrived in the United States on June 4, 1991. On June 5, 1991, the suppliers sent Alvarez written instructions by facsimile from Colombia regarding the distribution of the cocaine. The instructions directed that, among others, Matiz should receive 51½ kilograms of the cocaine.

Alvarez telephoned Matiz on numerous occasions to discuss the details of the pickup of her portion of the cocaine. During these conversations, Matiz expressed her desire to obtain her portion of the cocaine as soon as possible. Initially, she also voiced an interest in purchasing some of the cocaine that Alvarez had received as his fee for transporting the cocaine. Ultimately, however, she decided against it because of financial constraints.

Finally, Alvarez informed Matiz that she would be able to pick up her portion of the cocaine on June 12, 1991. He reserved a hotel room for Matiz in Middleboro, Massachusetts near the site for the transfer of the cocaine. Matiz and Diaz arrived at the hotel on June 10. In a continued effort to conceal their identities, they checked into the hotel using fictitious names and addresses.

The following evening, Alvarez and Special Agent Dillon met Matiz at the hotel to review the final arrangements for the pickup. A number of Matiz's assistants, who had arrived at the hotel on the same day as Matiz, were designated to collect the cocaine. Also, during this meeting, Agent Dillon gave Matiz a facsimile message from the suppliers that they sent to Alvarez instructing her to deposit the purchase price for the cocaine in various accounts in branches of the Chase Manhattan Bank and the Central Bank in Miami.

At the time of the pickup, one of Matiz's assistants followed an undercover agent to the warehouse where the car was loaded. Matiz, however, remained behind at the hotel with another undercover agent who was to accompany her to a meeting with Alvarez. On the way, they decided to purchase a bottle of champagne to celebrate the deal.

Upon arriving at the liquor store, an agent placed Matiz under arrest.

## II.

### A. Sufficiency of the Evidence

■ Matiz first disingenuously contends that the evidence produced at trial does not show that she knew of or participated in the conspiracy. Rather, she claims that she "recklessly made a loan to her friend." In evaluating a claim of insufficiency of the evidence, we "review the evidence as a whole, including all reasonable inferences from that evidence, in the light most favorable to the government." *United States v. Argencourt*, 996 F.2d 1300, 1303 (1st Cir.1993). In addition, both direct and circumstantial evidence must be credited on appeal. *United States v. Echeverri*, 982 F.2d 675, 677 (1st Cir.1993). Thus, as long as a jury could rationally find guilt beyond a reasonable doubt, we must affirm. *Argencourt*, 996 F.2d at 1303.

■ Matiz is unable to overcome the very heavy burden that a claim of insufficiency of evidence places upon her. There is an abundance of evidence that Matiz knowingly participated in the conspiracy to distribute cocaine. Granted, Matiz's role initially was to supply Alvarez with a payment of money. That payment, however, was intrinsically linked to the drug conspiracy to smuggle illicit drugs into the United States. The advance payment would facilitate the transportation of the cocaine. In addition, the Government presented evidence at trial that Matiz spoke to Alvarez over thirty times, in code, with respect to the shipment of the cocaine. Moreover, the facsimile from the suppliers in Colombia noted that Matiz was an intended recipient of the cocaine.

Finally, Matiz organized and directed the pickup operation in Massachusetts. Although she herself did not go down to load the cocaine, she sent an assistant of hers to do the task. The jury simply did not believe Matiz's incredible story concerning her lack of involvement in the conspiracy. Because of the abundance of evidence supporting the jury's verdict, this challenge is rejected.

### B. Outrageous Government Misconduct

■ Matiz next contends that her conviction should be overturned because the Government's conduct throughout the course of the investigation constituted outrageous misconduct in violation of her Due Process rights. Her claim essentially rests on the Government's initiation of the transaction, the arranged transportation of the cocaine into the country, and its delivery to various individuals including herself.

■ Law enforcement conduct runs afoul of the Due Process Clause of the Fifth Amendment when it violates "fundamental fairness, shocking to the universal sense of justice." *United States v. Russell*, 411 U.S. 423, 432, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973) (quoting *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 246, 80 S.Ct. 297, 304, 4 L.Ed.2d 268 (1960)). *See also Hampton v. United States*, 425 U.S. 484, 491–95, 96 S.Ct. 1646, 1650–53, 48 L.Ed.2d 113 (1976) (Powell, J., concurring); *id.* at 495–500, 96 S.Ct. at 1653–55 (Brennan, J., dissenting); *United States v. Twigg*, 588 F.2d 373, 381 (3d Cir.1978).

This court has reviewed many claims similar to the one advanced here and has consistently rejected them. *See, e.g., United States v. Santana*, 6 F.3d 1 (1st Cir.1993); *United States v. Barnett*, 989 F.2d 546, 560 (1st Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 148, 126 L.Ed.2d 110 (1993); *United States v. Marino*, 936 F.2d 23, 26–27 (1st Cir.1991); *United States v. Panitz*, 907 F.2d 1267, 1272–73 (1st Cir.1990). We have recognized that in these modern times with advanced technology and transportation facilities readily available to criminals, drug conspiracies, especially of an international character, are extremely difficult to penetrate and therefore enforcement ingenuity must be encouraged and greater government involvement allowed. *See Barnett*, 989 F.2d at 560; *Panitz*, 907 F.2d at 1273. The extent of government involvement here, initiating the transaction and transporting and delivering the cocaine, is no more excessive than government actions that have been upheld in other cases. *See Panitz*, 907 F.2d at 1273; *Marino*, 936 F.2d at 27.

■ Law enforcement conduct does not violate fundamental fairness when government officials do not foment crime, *cf. Twigg*, 588 F.2d at 381, but resourcefully penetrate an existing drug ring and engage in limited participation in their unlawful practices. "Such infiltration is a recognized and permissible means of investigation; if that be so, then the supply of some item of value that the drug ring requires must, as a general rule, also be permissible." *Russell*, 411 U.S. at 432, 93 S.Ct. at 1643. The record demonstrates that Matiz was an important figure in an organized conspiracy to smuggle illicit drugs into this country and distribute them. When the Colombian suppliers needed money to facilitate the transportation in this country, they turned to her. The suppliers' instructions to their associates in this country also filtered through her.

The Government did not entice Matiz to purchase and distribute cocaine. She already had an existing arrangement with her suppliers in Colombia and eagerly sought a substantial share of the smuggled drug load after it reached this country. Government agents never sought her out; the Colombian suppliers arranged to have Alvarez meet her. The Government, at the request of the suppliers, merely facilitated the transportation of the drugs into this country and Matiz freely joined in the arrangements and in acquiring a share of the contraband. Moreover, the Government did not take part in processing, packaging, or labelling any of the 615 kilograms of cocaine. Furthermore, they delivered the cocaine to individuals predetermined by the suppliers. We do not believe that the conduct of the agents employing guile, deception, and clever stratagems in infiltrating the Colombian drug ring and communicating with Matiz at the direction of the suppliers to obtain funds for the transportation of the drugs to this country constituted outrageous and impermissible conduct. *See Panitz*, 907 F.2d at 1273.

■ As an alternative to vacating Matiz's conviction based on the Government's violation of her Due Process rights, Matiz requests that this court use its supervisory power to reverse her conviction. Guided by considerations of justice, federal courts may exercise on a limited basis their supervisory power to "formulate procedural rules not specifically required by the Constitution or the Congress." *United States v. Hasting*, 461 U.S. 499, 505, 103 S.Ct. 1974, 1978, 76 L.Ed.2d 96 (1983). The Supreme Court has recognized only three legitimate purposes for the exercise of a court's supervisory power: "To implement a remedy for violation of recognized rights, to preserve judicial integrity, ... and finally, as a remedy designed to deter future illegal conduct." *Id.* (citations omitted).

Neither of these three bases are applicable to the case *sub judice*. As discussed previously, the Government's conduct was not outrageous, and Matiz fails to show any specific violation of a statutory or constitutional right. Moreover, preserving judicial integrity is only a basis for a court to use its supervisory power to supervise its own affairs, not the affairs of other government branches. The court's supervisory power does not "justify a chancellor's foot veto over activities of coequal branches of government." *See United States v. Simpson*, 927 F.2d 1088, 1089 (9th Cir.1991) (citations omitted). Since the conduct alleged by Matiz to be outrageous occurred outside the courtroom, judicial integrity is not at risk and therefore cannot be used as a basis for a court to invoke its supervisory power. *See id.* Finally, since there was no past illegal conduct on the part of the Government with respect to Matiz, we could not use our supervisory power to deter it from engaging in *future*, illegal conduct. *See Id.* at 1091. Thus, the use of our supervisory power is not warranted under the present facts.

## C. Enhancement for Obstruction of Justice

■ Finally, Matiz presents two challenges to the district court's enhancement of her sentence for obstruction of justice pursuant to U.S.S.G. § 3C1.1. Her first challenge is that the district court failed to make specific findings necessary to establish perjury.

■ Section 3C1.1 requires a sentencing court to enhance a defendant's sentence level by two points "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of jus-

tice during the ... prosecution ... of the instant offense." The commentary to § 3C1.1 provides that committing perjury is an example of the type of conduct to which this enhancement applies. U.S.S.G. § 3C1.1, comment (n. 3(b)). The Supreme Court has stated that a witness testifying under oath commits perjury if "she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan,* —— U.S. ——, ——, 113 S.Ct. 1111, 1116, 122 L.Ed.2d 445 (1993).

An enhancement for obstruction of justice is sufficiently supported where a sentencing court makes a finding "that encompasses all of the factual predicates for a finding of perjury". *Id.* at ——, 113 S.Ct. at 1117. At Matiz's sentencing the court made the following finding:

> I don't need to address the issue of Ramirez.[2] I do not wish to imply that a defendant does not have a right to testify. I make an independent determination here that I simply did not credit Ms. Matiz' testimony when she did testify. It's my determination that I do not believe her. I believe that she knowingly told a false story and, accordingly, will overrule the objection. It's appropriate to have an upward adjustment for obstruction of justice in this case.

The court also stated that it "finds the defendant did commit perjury."

■ The findings encompass all the elements of perjury—falsity, materiality, and willfulness. The only matter about which the court was not explicit was whether Matiz's testimony was material. A sentencing court, however, is not required to address each element of perjury in a separate and clear finding. *See id.* In fact, the Court in *Dun-*

*nigan* affirmed a district court's finding that did not use the term willful.[3] *Id.* at ——, 113 S.Ct. at 1113. *Dunnigan* only requires that a sentencing court's findings encompass all of the factual predicates for a finding of perjury.

Moreover, the record demonstrates that Matiz's false testimony denying knowledge of and participation in the conspiracy was material. If believed, the jury would have acquitted her. Thus, we can make the determination of materiality on our own without remanding to the district court. *See United States v. Arias–Villanueva,* 998 F.2d 1491, 1513 (9th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 359, 126 L.Ed.2d 322 (1993). Therefore, the challenge to the district court's failure to make specific findings is rejected.

■ Matiz also contends that the district court erroneously found that she committed perjury inasmuch as the record contains no evidence of material untruths. In reviewing a court's application of the sentencing guidelines to facts of a case, we use a "clearly erroneous" standard. *See United States v. Wright,* 873 F.2d 437 (1st Cir.1989). We perceive no clear error; on the contrary, the record overwhelmingly supports the district court's finding.

Throughout her testimony, Matiz argued that she merely loaned money to a friend and that she was otherwise unconnected to the drug conspiracy. The Government, however, rebutted her explanation and proved at trial through the use of recordings and testimony from Government agents that she was intimately connected to the drug conspiracy. Thus, we cannot say that the district court committed error in finding that Matiz perjured herself.

---

**2.** The court's reference to "Ramirez" concerns evidence presented at trial that Matiz used an alias, Maria Ramirez. On cross-examination, Matiz denied using the alias, even though a social security card and an apartment lease bearing that name were found in her diary. Additionally, her landlord identified her as the woman he knew as Ramirez.

**3.** The finding at issue in *Dunnigan* stated:

> The court finds that the defendant was untruthful at trial with respect to material matters in this case. [B]y virtue of her failure to give truthful testimony on material matters that were designed to substantially affect the outcome of the case, the court concludes that the false testimony at trial warrants an upward adjustment by two levels.

*Dunnigan,* —— U.S. at ——, 113 S.Ct. at 1117.

## III.

In sum, we conclude that: (1) the evidence introduced against Matiz was sufficient to support the guilty verdict returned by the jury, (2) the Government's conduct was not outrageous, and (3) the district court did not err in enhancing her sentence for obstruction of justice.

The judgment of the district court is

*Affirmed.*