# United States Court of Appeals
## For the First Circuit

No. 17-1031

UNITED STATES OF AMERICA,

Appellee,

v.

DANIEL COLBY, JR.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Kayatta, Stahl, and Barron,
Circuit Judges.

John L. Calcagni, III, with whom Larry J. Ritchie was on brief, for appellant.
Benjamin M. Block, Assistant U.S. Attorney, with whom Halsey B. Frank, U.S. Attorney, and Julia M. Lipez, Assistant U.S. Attorney, were on brief, for appellee.

February 14, 2018

**STAHL**, <u>Circuit Judge</u>.  Following a two-day jury trial, Defendant Daniel Colby, Jr. was convicted of a single count of possession of a firearm by a prohibited person in violation of 18 U.S.C. § 922(g)(1).  In calculating Colby's sentence, the district court applied a two-level enhancement for possession of a stolen gun, a four-level enhancement for using a gun in connection with another felony, and a two-level enhancement for obstructing justice by committing perjury at trial, which resulted in a guideline range of 84 to 105 months.  The district court sentenced Colby to 95 months in prison.  On appeal, Colby challenges the district court's application of these three enhancements.  After careful consideration, we affirm.

## I.

In March 2015, Colby was living in a camper in Wiscasset, Maine on property owned by his father.  Forrest J. Smith was a friend of Colby's father who lived nearby on Mountain Road in Woolwich, Maine.  Smith had occasionally worked for Colby's father prior to Colby taking up residence on his father's land.  A few days before March 17, 2015, Smith was walking home from Colby's father's house when he encountered Colby on the road.  Colby threw an M-80 firecracker at Smith and said "if you turn around right now I'll shoot ya."  Smith continued walking back to his trailer.

On March 17, 2015, at approximately 3:00 PM, Smith heard someone knocking on the door to his trailer claiming to be from

the power company. According to Smith's later testimony, Colby burst into the trailer, breaking the lock on the door. In response, Smith told Colby that he had called the cops about the firecracker incident. Colby stuck a gun in Smith's face and said "I ought to shoot you right now for calling the f-ing cops on me." Smith told Colby that he should leave, and Colby left the trailer still carrying the gun. Shortly thereafter, Smith called the police and reported that Colby had threatened him with a gun. Smith later described the gun as having "a short barrel" with "a brown, wooden handle."

Joey Rogers, who also lived on Mountain Road, testified at trial to the following. On March 17, 2015, he saw Colby walking up the road towards Smith's trailer at around 3:00 PM and, thirty to forty minutes later, he heard someone in his driveway trying to open the door to his truck. Looking over, Rogers saw Colby standing by his truck. According to Rogers, when he asked Colby what he was doing, Colby mumbled and started "pulling something from his sweatshirt pocket." Rogers could not see exactly what the object in Colby's pocket was, but he did see that it had a handle. As Colby walked towards Rogers, Rogers' dog ran at Colby. Colby took off running across the road, through a ditch, and into the woods.

Three days earlier, on March 14, 2015, Colby had visited Gregory Doray at his mother Stacey Doray's house. Jyllian

York, Gregory's sister who was nine months pregnant and on bedrest at the time, also lived with Stacey. At some point that day, Jyllian took Stacey's gun from Stacey's bedroom closet and hid it in her own bedroom closet. According to Jyllian's later testimony, she took the gun to give it to Gregory because she thought Gregory was in trouble with "bad people" and might need it. Colby, Gregory, and Gregory's girlfriend all ended up sleeping in the living room at Stacey's house that night.

The next morning, on March 15, 2015, Jyllian's boyfriend Cody Wyman discovered that the gun was missing from Jyllian's closet. Jyllian was scared that her mother would find out that she had taken the gun and did not, at that point, tell her mother that the gun was missing. After searching her room for about two hours, Jyllian asked everyone who had spent the night, including Colby, if they had the gun or knew where it was. No one would admit they had it.

On the evening of March 17, 2015, Jyllian texted and called Colby to ask him again if he had the gun or knew where it was. According to Jyllian, Colby told her that he had taken the gun and left it in a snowbank in the woods near Mountain Road. Jyllian and Wyman went out that night to look for the gun in the woods. In a series of text messages and phone calls, Colby tried to explain where he had put the gun, telling them that it was "stashed in snow . . . [a]t the end of the tracks." When Jyllian

- 4 -

and Wyman still could not find the gun, Colby texted that he would "run in the woods with Cody and get it" in the morning.

The next day, Jyllian and her younger sister returned to the woods to look for the gun. While they were searching, Officer James Read of the Wiscasset Police Department, who was out on patrol, saw their car parked on the side of the road and stopped. When Officer Read asked them what they were doing, Jyllian told him they were looking for a gun. At that point, the police took over the search for the gun. Some time later, after the snow had melted, the police recovered the gun at that location in the woods.

At trial, Colby testified in his own defense. He admitted that he had thrown the firecracker at Smith, but that he "thought it was kind of a joke" and he "wasn't intending to hurt him or nothing." He denied being at Smith's trailer on March 17, 2015, and claimed that he did not recall encountering Rogers that day.[1]

Colby also denied ever touching Stacey's gun. Colby claimed that Gregory had taken the gun and brought it to his girlfriend's home in Gardiner. According to Colby, he and Gregory then arranged to have a mutual friend place the gun in the woods so that they could return it to Stacey. Colby explained that he

---

[1] Colby admitted that he might have been walking back and forth near Rogers' house to get cell phone reception.

texted Jyllian directions to where he thought the mutual friend had left the gun.

On June 2, 2016, the jury found Colby guilty. On December 27, 2016, the district court sentenced him to 95 months in prison. The court imposed a two-level enhancement pursuant to U.S.S.G. § 2K2.1(b)(4)(A) for possessing a stolen firearm, a four-level enhancement pursuant to U.S.S.G. § 2K2.1(b)(6)(B) for possessing a firearm in connection with another felony offense, and a two-level enhancement pursuant to U.S.S.G. § 3C1.1 for willfully obstructing, impeding, or attempting to impede the administration of justice. In applying the final enhancement, the court found that Colby "perjured himself during trial by denying possession of the gun and denying his activities vis-a-vis Forrest Smith." The court found "all of those lies to be material" and found "that those lies, perjury, constitute obstruction."

## II.

We review the district court's legal interpretations of the sentencing guidelines de novo, and review its subsidiary factual findings for clear error. United States v. Corbett, 870 F.3d 21, 31 (1st Cir. 2017). When a defendant "challenges the factual predicate supporting the district court's application of a sentencing enhancement, 'we ask only whether the court clearly erred in finding that the government proved the disputed fact by a preponderance of the evidence.'" United States v. Cannon, 589

F.3d 514, 517 (1st Cir. 2009) (quoting United States v. Luciano, 414 F.3d 174, 180 (1st Cir. 2005)). We address each of Colby's challenges to the sentencing enhancements in turn.

A.   Possession of a Stolen Firearm

Colby claims the district court's finding that Stacey's gun was stolen was clearly erroneous. Before we can evaluate the district court's factual findings, we must determine the meaning of "stolen" as used in this provision of the guidelines. U.S.S.G. § 2K2.1(b)(4)(A) calls for a two-level enhancement "[i]f any firearm . . . was stolen." The comment to this provision states that "[s]ubsection (b)(4) applies regardless of whether the defendant knew or had reason to believe that the firearm was stolen."

Because the events of this case occurred in Maine, Colby argues that we should define "stolen" in accordance with Maine's theft statute. See Me. Rev. Stat. Ann. tit. 17-A § 353(1)(A). This we will not do. Guideline terms are "federal in character" and must have "a single, invariant meaning, rather than a meaning that changes from state to state." United States v. DeLuca, 17 F.3d 6, 8 (1st Cir. 1994). Guideline terms that are "not specifically defined therein generally should be given their common usage." Id. at 9. To ascertain a term's common usage, we may look to the laws of the various states, see, e.g., United States v. Cruz-Santiago, 12 F.3d 1, 2-3 (1st Cir. 1993), as well

as relevant federal law and other sources, DeLuca, 17 F.3d at 9. However, we are not bound to any particular state's definition of a legal term when construing terms used in the sentencing guidelines.

We turn then to our task of divining the common usage of "stolen." In United States v. Turley, the Supreme Court addressed the term "stolen" as it was used in the National Motor Vehicle Theft Act. 352 U.S. 407, 408 (1957). Finding that the term "has no accepted common-law meaning," the Court looked to the legislative purpose behind the act. Id. at 411, 413. The Court concluded that because Congress sought to prevent "innumerable forms of theft," the term should be read broadly to include "all felonious takings of motor vehicles with intent to deprive the owner of the rights and benefits of ownership, regardless of whether or not the theft constitutes common-law larceny." Id. at 416-17.

We agree with the Eighth Circuit that "the context of § 2K2.1(b)(4) . . . likewise requires a broad interpretation of 'stolen.'" United States v. Bates, 584 F.3d 1105, 1109 (8th Cir. 2009); see also United States v. Jackson, 401 F.3d 747, 749-50 (6th Cir. 2005). As mentioned above, § 2K2.1(b)(4) has no scienter requirement, and "[t]he history of the Guideline itself confirms that the omission was intentional." United States v. González, 857 F.3d 46, 56 (1st Cir. 2017). In González, we upheld the

provision against a due process challenge, recognizing that "stolen firearms present special dangers, especially in the hands of convicted felons . . . who cannot legally own any gun." Id. at 57. Because a broader reading "is consistent with the guideline's purpose to punish and deter the trade in stolen and altered firearms," we define "stolen" to encompass "all felonious or wrongful takings with the intent to deprive the owner of the rights and benefits of ownership, regardless of whether or not the theft constitutes common-law larceny." Bates, 584 F.3d at 1109; accord. Turley, 352 U.S. at 417.

Turning to the facts of this case, the district court explicitly found that the gun was stolen and that the defendant knew it was stolen, even though such knowledge is irrelevant to whether the enhancement applies. The sentencing record supports these findings. Jyllian took the gun from her mother's bedroom without permission with the intent to give the gun to her brother Gregory. Therefore, the gun could already be classified as "stolen" when she hid it in her closet. Of course, someone then took the gun from Jyllian's closet. It was the government's position that Gregory took the gun from Jyllian's closet. Gregory slept at the house the night the gun disappeared from Jyllian's closet and Jyllian testified that Gregory was involved with "bad people" and may have needed the gun. Moreover, Colby himself testified that Gregory had stolen the gun.

Finally, the district court explicitly found that "the gun was hidden in the snow by the defendant and he did that to hide the gun." This finding, which the record amply supports, provides another basis for concluding that the gun was stolen. Colby himself at some point took the gun and hid it in the woods, thereby evincing an intent to deprive Stacey of the benefits of ownership.[2]

As to whether Colby possessed Stacey's gun, Smith testified that Colby threatened him with a gun that was similar in appearance, Rogers saw Colby holding something with a handle in his sweatshirt pocket, and Colby admitted that he had put the gun in the snow bank in the text messages and phone calls he had with Jyllian and Wyman.

Based on the evidence before it, the district court did not clearly err in finding that Colby possessed a stolen gun and therefore did not err in imposing the enhancement.

---

[2] We note that, even if we were to apply the law of Maine to define "stolen," which we will not do, these acts would likely qualify as theft under Maine law. See Me. Rev. Stat. Ann. tit. 17-A § 352(3)(C) ("intent to deprive" necessary for theft occurs where one "use[s] or dispose[s] of the property under circumstances that make it unlikely that the owner will recover it or that manifest an indifference as to whether the owner will recover it"); see also State v. Burns, 26 A.3d 817, 821 (Me. 2011) ("Although a person charged with theft may have intended to repay or otherwise restore the stolen property, that person may 'nonetheless consciously use . . . the money in a way which the jury could find made it unlikely that the [rightful owner] would recover it, in violation of section 352(3)(C).'" (quoting State v. Moon, 755 A.2d 527, 531 (Me. 2000))).

B.    Possession of a Firearm in Connection With Another Felony
      Offense

Colby claims the district court should not have imposed the four-level enhancement for possession of a firearm in connection with another felony offense because its finding that Colby had threatened Smith with Stacey's gun was clearly erroneous. U.S.S.G. § 2K2.1(b)(6)(B) provides for a four-level enhancement if a defendant "used or possessed any firearm or ammunition in connection with another felony offense."  The presentence report identified the other felony offense as criminal threatening with a dangerous weapon.

We see no clear error.  First, there was more than sufficient evidence for the district court to find that Colby had come to possess Stacey's gun before March 17, 2015.  Second, the district court found Smith's account of the incident at his trailer largely credible.  Although the district court acknowledged that there were some gaps in Smith's memory, it concluded that "someone who is -- has a gun pointed at his face may well disregard a memory of which way the door went in or out or even whether the gun had a wide barrel or a somewhat narrower barrel."  Having found Smith's testimony credible, the district court concluded that Colby used Stacey's gun to threaten Smith.  We see no reason to disturb the district court's credibility determination, and therefore find the district court did not err in imposing the enhancement.

## C.    Obstruction of Justice

Finally, we consider Colby's challenge to the district court's application of the enhancement for obstruction of justice. U.S.S.G. § 3C1.1 calls for a two-level enhancement "[i]f (1) the defendant willfully obstructed or impeded . . . the administration of justice with respect to the investigation, prosecution, or sentencing of the instance offense of conviction, and (2) the obstructive conduct related to . . . the defendant's offense of conviction and any relevant conduct."  "[C]ommitting perjury is an example of the type of conduct to which this enhancement applies." United States v. Matiz, 14 F.3d 79, 84 (1st Cir. 1994).  In order to impose the enhancement, the district court must make factual findings that "encompass all the elements of perjury -- falsity, materiality, and willfulness."  Id.

Colby focuses on the willfulness element, arguing that the district court failed to make a particular finding as to whether Colby made false statements "with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory."  United States v. Dunnigan, 507 U.S. 87, 94 (1993).  We generally do not require the district court to "address each element of perjury in a separate and clear finding." Matiz, 14 F.3d at 84.  Rather, we examine whether "a sentencing court's findings encompass all of the factual predicates for a finding of perjury."  Id.  Here, the district court found that

Colby "perjured himself during trial by denying possession of the gun and denying his activities vis-a-vis Forrest Smith" and further found "all of those lies to be material" and "that those lies, perjury, constitute obstruction."

In these circumstances, "[t]he nature of the material falsehood[s] . . . is not one in which the willfulness of the falsehood[s] could reasonably be questioned." United States v. Mercer, 834 F.3d 39, 49 (1st Cir. 2016). Colby flatly denied that he went to Smith's trailer on March 17, 2015 and threatened him. He testified that he never touched Stacey's gun and that he only saw the gun when Gregory had it. The district court permissibly concluded that Colby's completely contradictory accounts of these key facts in his case were not the result of "confusion, mistake, or faulty memory." Dunnigan, 507 U.S. at 94. We find no error in the district court's imposition of the obstruction of justice enhancement.

## III.

For the foregoing reasons, we affirm.