# United States Court of Appeals
## For the First Circuit

No. 18-1190

UNITED STATES OF AMERICA,

Appellee,

v.

JOSUÉ MENDOZA-MAISONET,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Torruella, Lipez, and Thompson,
Circuit Judges.

Julio César Alejandro-Serrano, for appellant.
Antonio L. Pérez-Alonso, Assistant United States Attorney,
with whom W. Stephen Muldrow, United States Attorney, and
Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief,
Appellate Division, were on brief, for appellee.

June 9, 2020

**TORRUELLA**, **Circuit Judge**.  After a four-day jury trial, Defendant-Appellant Josué Mendoza-Maisonet ("Mendoza") was convicted of possession of firearms in furtherance of drug trafficking crimes, in violation of 18 U.S.C. § 924(c)(1)(A) (Count One), and of possession with intent to distribute heroin (Count Two) and cocaine base (Count Three), both in violation of 21 U.S.C. § 841(a)(1).  The district court sentenced Mendoza to ninety-nine months in prison.  He now appeals his convictions and sentence.  Mendoza challenges the sufficiency of the evidence supporting his convictions, as well as the denial of his motion to suppress certain statements that he made to law enforcement officers while in custody and the evidence obtained during the search of his friend's residence where he was found spending the night.  With respect to his sentence, Mendoza argues that the district court erred in applying a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1 based on a finding that he had perjured himself during trial, and in denying his request for a mitigating role adjustment under U.S.S.G. § 3B1.2 based on his purported minimal participation in the crime.  After carefully reviewing Mendoza's claims, we affirm his convictions and sentence.

## I.  Background[1]

### A.  Factual Background

#### 1.  Events Leading to Mendoza's Arrest

On March 23, 2016, Agent Víctor Marrero-Rivera ("Agent Marrero"), an agent in the Stolen Vehicles Division of the Puerto Rico Police Department ("PRPD"), was assigned to conduct surveillance at residence C-16 of the Vistas de Atenas Housing Project in Manatí, Puerto Rico.  During his surveillance, Agent Marrero observed that a blue Suzuki Vitara, which had been reported stolen, was parked in front of the residence's premises.  He then observed a "dark-color-skinned individual" arrive in a white Suzuki Vitara, which had also been reported stolen.  As the individual -- later identified as Joshua Valle-Colón ("Valle") -- exited the vehicle, Agent Marrero observed him adjust a pistol in his waistband and then enter the residence.  Based on his surveillance, Agent Marrero obtained a state-issued warrant to search residence C-16 and its surrounding yard for two stolen vehicles -- blue and white Suzuki Vitaras identified by license plate numbers -- and firearms.

On the early morning of March 24, 2016, PRPD agents executed the search warrant.  Upon entering the residence to

---

[1] We provide the key facts in this section and fill in more details relevant to each issue along the way.

conduct a protective sweep, the entry team encountered Mendoza sleeping in what appeared to be a child's bedroom.[2] They identified themselves as police officers and then took Mendoza to the living room.[3] The entry team continued the sweep of the residence and found Valle, his wife Elizabeth Colón ("Colón"), and their small child asleep in the second bedroom. The entry team again identified themselves and took Valle, Colón, and the child to the living room.

Once the area was secured, PRPD agent Steven Pérez-Espinosa ("Agent Pérez") oversaw the execution of the search warrant. Upon entering, Agent Pérez encountered Mendoza, Valle, Colón, and the child in the living room and, after explaining that he was there to execute a search warrant, Agent Pérez asked who was responsible for the residence. Valle responded that he was, and Agent Pérez asked Valle to accompany him during the search.[4] First, Agent Pérez searched the main bedroom where Valle and Colón were found, and he discovered two clear pressure-sealed bags

---

[2] PRPD agent Modesto Alameda-Cordero ("Agent Alameda"), who was assigned to the entry team, testified that, based on the way the room was decorated, the bed sheets used, and the toys spread around the room, he thought that it was a child's bedroom.

[3] Mendoza was not handcuffed or arrested at this time.

[4] Colón also indicated that she was responsible for the residence but stated that she was not feeling well. Agent Pérez called the paramedics and executed the search accompanied by Valle only.

containing marijuana in plain view on top of the dresser. Based on this discovery, Mendoza, Valle, and Colón were read their Miranda warnings and placed under arrest. Agent Pérez then resumed the search of the main bedroom with Valle present and, when he looked in the closet area, he found drug paraphernalia (clear baggies with pressure seals and a device used to cut marijuana for distribution purposes) inside an open shoebox.

Next, Agent Pérez searched the bathroom, which was close to the main bedroom, but found nothing there. He then proceeded to the child's bedroom where Mendoza had been sleeping.[5] Amongst children's toys on top of the dresser, he saw an unlabeled pill bottle with what were later identified as two Percocet pills, a watch, and a necklace, all of which Mendoza admitted belonged to him. Then, in the bedroom closet, Agent Pérez found a green and orange backpack that "fel[t] . . . heavy." This prompted him to open the bag, where he discovered on the inside a loaded Kel-Tec rifle, forty plastic capsules containing crack cocaine, several clear baggies that were similar to the ones found in Valle and Colón's room,[6] and a toothbrush. At that point, Mendoza, who was

---

[5] Valle informed Agent Pérez that the room where Mendoza was sleeping belonged to his toddler son.

[6] The baggies had a sticker of an apple on them, which Agent Pérez testified was sometimes used in "drug points" to "identify the drugs."

sitting in the living room in his boxers, requested to put his pants on, which he had left folded on top of a table in the child's bedroom. Agent Pérez brought Mendoza to the child's room and, before giving him the pants, he searched its pockets and found three baggies of marijuana and $266 in cash. The baggies looked the same as those found earlier in Valle's bedroom. Mendoza's shoes were also found by the foot of the bed in the child's room.

The search then moved to the kitchen area, where Agent Pérez saw a black pistol in plain sight on top of the kitchen cabinets.[7] He accessed the top of the cabinet by climbing on a chair and discovered a box of bullets, sixty decks of heroin, and a plastic pressure-sealed bag containing $129, all together with the pistol, which was loaded. The agents then searched the residence's surrounding yard and parking area, where they identified the two stolen vehicles described in the search warrant. Inside the trunk of one of the vehicles -- in the blue Vitara -- Agent Pérez found two packages of over a thousand empty plastic capsules, along with their lids, which were identical to those found containing crack cocaine inside the backpack in the child's room.[8] Alongside the capsules, Agent Pérez found a pair of

---

[7] The pistol was visible from a normal height because it was propped on top of a box of bullets and heroin packets.

[8] Agent Pérez testified that the capsules are "used for

sneakers that Mendoza admitted belonged to him. The agents concluded the search, seized the contraband, and transported Mendoza, Valle, and Colón to the police station.

### 2. Mendoza's Interviews with Law Enforcement

At the police station, Mendoza was interviewed by agents five separate times. For the first interview, Agent Pérez removed Mendoza from his cell, took him to a separate room, handed him a document that stated his legal rights, and verbally explained those rights to him. Mendoza read the document and acknowledged that he understood its contents by signing it.[9] He stated that he did not have anything to say, so Agent Pérez returned him to his cell. Ten to fifteen minutes later, Agent Pérez removed Mendoza from his cell again, transferred him to the private room, and once again informed him of his rights.[10] According to Agent Pérez, Mendoza then verbally confessed "freely and voluntarily" that all the property seized during the search belonged to him and Valle.[11]

---

distribution of a controlled substance."

[9] Agent Pérez testified that Mendoza did not appear to be under the influence of any drugs or alcohol and that he appeared normal, calm, and comfortable.

[10] Agent Pérez testified that Mendoza had requested to speak to him, whereas Mendoza testified that he did not request a second interview.

[11] There was no contemporaneous record made of this confession. Mendoza maintains on appeal that he told Agent Pérez that he did not want to speak and that he only confessed to possessing any contraband because Agent Pérez threatened to prosecute Colón.

Homeland Security Investigations ("HSI") task force agent Erick del Valle ("Agent del Valle") also interviewed Mendoza at approximately 12:45 p.m. He read Mendoza his Miranda warnings in both English and Spanish and provided him with a written copy, which Mendoza signed and acknowledged that he had understood. Mendoza waived his rights, both verbally and in writing, and agreed to talk to Agent del Valle without an attorney present. During the interview, Mendoza told Agent del Valle that the marijuana and money that were found in his pants belonged to him, and he then asserted that he did not want to make any other statements, so Agent del Valle returned him to his cell. Approximately two hours later, Agent del Valle pulled Mendoza for a second interview with him to ask about the other contraband seized during the search. He told Mendoza that if someone did not take ownership of the rest of the contraband (i.e., the guns, heroin, crack cocaine, and paraphernalia), that he, Valle, and Colón would have to be charged. Mendoza then admitted, as he had told Agent Pérez earlier, that the rest of the contraband belonged to him and Valle and that Colón had nothing to do with it.

Mendoza also maintains that he did not confess to possessing everything seized, only the marijuana found in his jeans and on the dresser in Valle's room.

-8-

Agent Pérez then conducted a final interview to ask Mendoza if he would put in writing what he had told him earlier regarding ownership of the seized items. He obtained a written confession that read: "The bags that were seized in the pants and the money are mine. The ones seized in the house are [Valle's] and mine. [Colón] has nothing to do with this or anything that was seized inside the house, like the drugs, the weapons, et cetera." Both Agent Pérez and Agent del Valle testified that Mendoza's written statement was consistent with his verbal confessions to them.

## B. Procedural History

### 1. Indictment and Motion to Suppress Proceedings

On July 20, 2017, a federal grand jury returned a three-count superseding indictment[12] charging both Mendoza and Valle with possession of firearms in furtherance of drug trafficking crimes, in violation of 18 U.S.C. § 924(c)(1)(A) (Count One), and possession with intent to distribute both heroin and crack cocaine, in violation of 21 U.S.C. § 841(a)(1) (Counts Two and Three, respectively).[13]

---

[12] The original indictment was filed on March 30, 2016.

[13] Valle entered a straight plea on the second day of his jury trial and was sentenced to eighty-eight months of imprisonment. He filed an appeal, which is pending with this Court.

-9-

Mendoza moved to suppress all the items seized from Valle's residence and the statements he made to the interviewing agents.[14] He argued that (1) the search warrant lacked the particularity necessary to justify a search of the residence and (2) his statements were involuntary as they were coerced by threats that Colón would be prosecuted. In its opposition, the Government argued that (1) Mendoza did not have standing to challenge the search because he did not have a reasonable expectation of privacy in the dwelling; (2) the warrant was not overly broad and met the particularity requirement; and (3) the confessions were knowing and voluntary. The motion was referred to a U.S. magistrate judge.

At the suppression hearings, the magistrate judge heard testimony from Agent Pérez, Agent del Valle, and co-defendants Mendoza and Valle. The magistrate judge ultimately recommended that Mendoza's motion be denied in full. In his report and recommendation, the magistrate judge did not decide whether the affidavit supporting the search warrant provided sufficient probable cause to authorize the search of the residence, instead relying on the good faith exception to uphold the search.[15] He

---

[14] Valle also filed a motion to suppress the same day.

[15] The magistrate judge also concluded that Mendoza had a reasonable expectation of privacy as an overnight guest and therefore had standing to request suppression. See United States v. Bain, 874 F.3d 1, 13 (1st Cir. 2017).

also concluded that Mendoza's verbal and written statements had been made voluntarily as Mendoza's relationship with Colón was too attenuated to make Mendoza "vulnerable to succumb" to threats of what would happen to her. Mendoza objected to all of the legal findings in the report and recommendation and additionally raised, for the first time, that his right to silence had been violated and therefore his statements should be suppressed. The district court, however, adopted the magistrate judge's recommendation to deny Mendoza's motion to suppress.

## 2. Trial

Mendoza's jury trial began on August 22, 2017. During its case-in-chief, the Government called six witnesses, including Agent Pérez, who testified about the execution of the search warrant, the items seized, and his interviews with Mendoza, as well as Agent del Valle, who also testified about interviewing Mendoza and the verbal confession that all of the contraband seized in the residence belonged to him and Valle. The Government also presented the testimony of Drug Enforcement Administration ("DEA") chemist Elizabeth Adkins, who was qualified as an expert in forensic chemistry and analysis of narcotics and controlled substances and who testified to the nature of the substances found -- cocaine base (crack cocaine), heroin, marijuana, and Percocet.

The Government then called DEA Task Force agent Eddie Vidal-Gil ("Agent Vidal") as an expert in the fields of drug trafficking and the value of controlled substances. Agent Vidal testified as to the quantity, quality, manner of packaging, and value of the drugs seized, and asserted that based on those characteristics and the paraphernalia found, the drugs were not for personal use but for trafficking. He also testified that, in his experience, drug traffickers often keep firearms for protection, and that while they are not always stored with the drugs, they are always stored in a place accessible to the trafficker. Additionally, he noted that it was very common for drug users to also distribute drugs for retail.

The Government's two other witnesses were Agent Alameda, who testified about his role as a member of the entry team assigned to the search of Valle's residence, and HSI agent Jorge Cruz, who test-fired the firearms seized and confirmed that they were indeed firearms. After the Government rested, Mendoza moved for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure, which the court denied.

Mendoza took the stand in his own defense.[16] He testified that he, Valle, and Colón were friends, that he had known

---

[16] The defense's other witness was Agent Marrero, who testified about his surveillance of Valle and Colón's residence.

them for five or six years, and that he had become closer to them during the four to five months prior to their arrest. He also explained that he had been dating Colón's niece and that he had slept at Colón and Valle's residence, in the child's bedroom, with her on several occasions.[17] Despite his admitted close relationship with Colón and Valle and his frequent visits to their home, Mendoza testified that he did not feel comfortable wandering the house and would ask permission before using the bathroom or going into the kitchen or bedroom. He also said that he never opened the closet in the child's bedroom and that the first time he saw the backpack was when Agent Pérez was carrying it out of the residence. Finally, Mendoza testified that his written confession pertained only to the money and the baggies of marijuana that had been found in his jeans and on Valle's dresser, not to the other items seized during the search. After Mendoza's testimony, the defense renewed its motion for acquittal, which the court again denied. On August 25, 2017, after a four-day trial, the jury found Mendoza guilty of all counts.

---

[17] Mendoza testified that he was at Colón and Valle's residence on the night of March 23, 2016, to meet up with Colón's niece, but that she ended up not coming. He testified that he did not want to stay overnight, but Valle was tired and would not drive him home until the next morning. He also admitted that later that night he and Valle smoked marijuana together in the living room.

### 3. Sentencing

At sentencing, the district court rejected Mendoza's request for a role adjustment for his purported minimal participation in the offense under U.S.S.G. § 3B1.2, as well as his objection to an enhancement for obstruction of justice based on perjury. Accordingly, the court applied the two-level enhancement provided in U.S.S.G. § 3C1.1 but no reductions. Ultimately, the district court sentenced Mendoza to ninety-nine months of imprisonment: seventy-two months of imprisonment for Count One to be served consecutively to concurrent sentences of twenty-seven months of imprisonment for Counts Two and Three. Mendoza timely appealed.

## II. Discussion

### A. Sufficiency of the Evidence

Mendoza argues that he should have been acquitted of all charges because the Government did not present sufficient evidence to support his convictions. Mendoza contends that the Government failed to establish that he had either actual or constructive possession of the drugs or the firearms seized from the residence. Specifically, he avers that his friendship with Valle, the fact that he would occasionally sleep at his house, including at the time of the search, and the fact that he was sleeping in the room where the backpack was found is not enough to show that he knew

-14-

the contraband was in the residence and that he had the intention and power to exercise control over it. According to Mendoza, the Government failed to establish that he trafficked drugs or possessed guns outside of the residence, or that he had any knowledge that Valle was involved in such criminal activity. Further, he avers that his written statement did not admit possession of all of the contraband but only of the marijuana found in his pants and on Valle's dresser and thus the statement did not provide a basis for the Government's broad interpretation.

Mendoza also contends that the Government failed to present evidence that Mendoza "knew about the illicit nature of the substance in the capsules and decks, and of circumstances which would directly or implicitly indicate that they would be trafficked." While the jury could infer from the testimony of Agent Vidal that the drugs and paraphernalia were used for drug trafficking activities, his argument goes, none of the evidence suggests that Mendoza had any relationship with the items, and there was no evidence to counter the possibility that both stashes of drugs belonged to Valle. Mendoza further posits that because the Government did not provide any evidence to establish that he was involved in drug trafficking, there was no basis for a finding of the "in furtherance of" element of the firearms crime. Thus,

he claims that the district court erred in denying his Rule 29 motion for acquittal.

We disagree.

## 1. Standard of Review

Because Mendoza preserved his challenge to the sufficiency of the evidence, we assess his claims de novo. United States v. Rodríguez-Torres, 939 F.3d 16, 23 (1st Cir. 2019). This means we review the evidence, "both direct and circumstantial, in the light most favorable to the prosecution and decide whether that evidence, including all plausible inferences drawn therefrom, would allow a rational factfinder to conclude beyond a reasonable doubt that the defendant committed the charged count or crime." United States v. Velázquez-Aponte, 940 F.3d 785, 798 (1st Cir. 2019) (quoting United States v. Díaz-Rosado, 857 F.3d 116, 120 (1st Cir. 2017)). We will not "re-weigh the evidence[] or second-guess the jury's credibility calls." United States v. Acevedo-Hernández, 898 F.3d 150, 161 (1st Cir. 2018) (citing United States v. Santos-Soto, 799 F.3d 49, 57 (1st Cir. 2015)). Nor do we have to be convinced "that the government succeeded in eliminating every possible theory consistent with the defendant's innocence." Id. (quoting United States v. Trinidad-Acosta, 773 F.3d 298, 310-11 (1st Cir. 2014)). We reverse "only if the

defendant shows that no rational factfinder could have found him guilty."  Rodríguez-Torres, 939 F.3d at 23.

## 2. Drug Charges

To make out a case of possession with intent to distribute a controlled substance under 21 U.S.C. § 841(a)(1), the government has to prove "that the defendant[] knowingly and intentionally possessed, either actually or constructively, a controlled substance with the specific intent to distribute." United States v. García-Carrasquillo, 483 F.3d 124, 130 (1st Cir. 2007) (citing United States v. López-López, 282 F.3d 1, 19 (1st Cir. 2002)).  Actual possession means "immediate, hands-on physical possession."  United States v. Padilla-Galarza, 886 F.3d 1, 5 (1st Cir. 2018).  On the other hand, constructive possession is shown by proving that the defendant had "dominion and control over the area where the contraband was found."  Id. (internal quotation marks omitted) (quoting United States v. Wight, 968 F.2d 1393, 1397 (1st Cir. 1992)); see also García-Carrasquillo, 483 F.3d at 130 ("Constructive possession exists when a person knowingly has the power and intention at a given time to exercise dominion and control over an object either directly or through others." (quoting United States v. McLean, 409 F.3d 492, 501 (1st Cir. 2005))).  Constructive possession "does not require actual ownership," United States v. Ridolfi, 768 F.3d 57, 62 (1st Cir.

2014), and "can be established through circumstantial evidence," United States v. Howard, 687 F.3d 13, 20 (1st Cir. 2012), although the "mere presence or association with another who possessed the contraband is insufficient," United States v. Hicks, 575 F.3d 130, 139 (1st Cir. 2009) (internal quotation marks omitted) (quoting United States v. DeCologero, 530 F.3d 36, 67 (1st Cir. 2008)). As to the intent-to-distribute element, "[a]n inference of intent to distribute may be drawn from the circumstances surrounding possession, including the drug's quantity (i.e., whether it is too large for personal use only), the drug's purity, the defendant's statements or conduct, or the number of people involved and their relationship to the defendant." United States v. Bobadilla-Pagán, 747 F.3d 26, 33 (1st Cir. 2014).

The evidence in this case is sufficient to permit a jury to reasonably find beyond a reasonable doubt that Mendoza knowingly possessed the heroin and crack cocaine with intent to distribute. To begin, the jury learned that Mendoza had admitted in interviews with Agent Pérez and Agent del Valle that all of the items seized during the search belonged to him and Valle.[18] The Government also presented the handwritten statement that Mendoza gave to the agents, which read: "The bags that were seized in the pants and

_____

[18] We explain below why Mendoza's statements did not have to be suppressed.

-18-

the money are mine. The ones seized in the house are [Valle's] and mine. [Colón] has nothing to do with this or anything that was seized inside the house, like the drugs, the weapons, et cetera." Agent Pérez and Agent del Valle both testified that the written statement was consistent with the admissions that Mendoza had verbally given to them earlier regarding his ownership of all the contraband. While Mendoza disputes that he confessed to possessing everything seized instead of only the marijuana found in his jeans and on the dresser in Valle's room, the jury chose to believe the officers' testimony and drew its own reasonable inferences from the written and verbal statements, which we are not to disturb. See United States v. Smith, 680 F.2d 255, 259 (1st Cir. 1982) ("[I]f the evidence can be construed in various reasonable alternatives, the jury is entitled to freely choose from among them." (citing United States v. Klein, 522 F.2d 296, 302 (1st Cir. 1975))).

Moreover, additional evidence, construed in the light most favorable to the verdict, shows that Mendoza had possession of the backpack containing the rifle, crack cocaine capsules, and empty baggies found in the child's bedroom where Mendoza was sleeping and where a number of other items that belonged to him were also found, such as his shoes, Percocet pills, watch, necklace, and clothing. Mendoza himself admitted that he had been

dating Colón's niece and that he had slept in the child's bedroom on several occasions. A jury could reasonably infer from these facts, including Mendoza's ownership of certain items and personal belongings and their proximity to the backpack in the closet, that Mendoza exercised dominion and control over the bedroom and had the ability and intention to exercise dominion or control over the contraband found within it. See United States v. Bristol-Mártir, 570 F.3d 29, 39 (1st Cir. 2009) (explaining jury can infer constructive possession from "defendant's dominion and control over an area where narcotics are found" (quotation marks omitted) (quoting United States v. Gobbi, 471 F.3d 302, 309 (1st Cir. 2006))). Moreover, the fact that Valle was in charge of the residence and could thus also be the owner of the items does not negate possession by Mendoza because constructive possession can be joint. See Hicks, 575 F.3d at 139. Consequently, the jury could find that Mendoza constructively possessed the cocaine, rifle, and paraphernalia.

Furthermore, the evidence shows that the empty capsules found in one of the stolen cars' trunks were identical to those filled with crack cocaine found hidden in the backpack located in the room where Mendoza slept. Next to those empty capsules were also Mendoza's sneakers. These facts further support the jury's finding that the items belonged to Mendoza.

-20-

Similarly, the jury could have inferred that Mendoza had constructive possession of the pistol and heroin found on top of the kitchen cabinet.  The Government presented evidence that the contraband was in plain sight and in a common living area of a home Mendoza visited and stayed at several times, and therefore, was accessible to Mendoza.  The evidence also showed that Mendoza, Valle, and Colón were close friends, that Mendoza on average felt comfortable in the house, and that he and Valle smoked marijuana in the living room area.  Therefore, the jury could reasonably infer that Mendoza knew those items were there and that he had "the power and intention at a given time to exercise dominion and control over" the pistol, heroin, and the other items found together with the pistol "either directly or through [Valle and Colón]," and consequently, that he had constructive possession of such items.  García-Carrasquillo, 483 F.3d at 130.

The record also supports the jury's finding that Mendoza intended to distribute the drugs.  Agent Pérez testified that he found forty plastic capsules holding crack cocaine hidden in the backpack and sixty aluminum wrappings (the decks) of heroin in a plastic bag on top of the kitchen cabinet bound with cash and a pistol.  Agent Pérez also told the jury that he had found over a thousand empty capsules like the ones used to hold the crack cocaine in the trunk of one of the stolen cars, and that these

were "used for distribution of a controlled substance."  The jury was entitled to believe these statements, see United States v. Rivera-Rodríguez, 617 F.3d 581, 595 n.6 (1st Cir. 2010) (noting that we "do not assess the credibility of a witness, as that is a role reserved for the jury" (quoting United States v. Troy, 583 F.3d 20, 24, (1st Cir. 2009))), and in any event, it could infer from the number of individual packages that the drugs were intended for distribution rather than for personal use.  See United States v. Ayala-García, 574 F.3d 5, 13 (1st Cir. 2009) ("[A] large amount and individual packaging of drugs is sufficient to demonstrate an intent to distribute for purposes of section 841(a)(1).").

Agent Vidal's expert testimony that the crack capsules found in the backpack were "typical packaging of crack capsules to be distributed, [for] retail" further confirmed Mendoza's intent to distribute. He also explained generally how heroin was packaged for distribution and told the jury that, based on the packages found in the residence and the amount, that it was for distribution rather than for personal use.  Agent Vidal further testified that when drugs are possessed for distribution, one might also find paraphernalia, like the plastic baggies and empty plastic vials found here, "to process [the drugs]."  Moreover, the evidence showed that $129 in cash were found together with the heroin decks and another $266 were found in Mendoza's pants.  A loaded rifle

and pistol were also found with the crack and heroin, respectively, and Agent Vidal explained that keeping money together with drugs, and using guns for protection, were common behaviors for people who possess drugs for distribution. The jury was entitled to believe Agent Vidal's testimony, see Rivera-Rodríguez, 617 F.3d at 595 n.6, and from these facts, the jury could reasonably infer an intent to distribute.

Considering all the evidence and the reasonable inferences drawn therefrom in the light most favorable to the verdict, we conclude that the evidence was sufficient to support Mendoza's convictions on Counts Two and Three. Accordingly, his first attempt to undermine the jury's verdict falls short, and we turn to his second claim.

### 3. Firearms Charge

To convict Mendoza for possessing a firearm in furtherance of a drug trafficking crime under 18 U.S.C. § 924(c)(1)(A), the Government had to prove that he "1) committed a drug trafficking crime; 2) knowingly possessed a firearm; and 3) possessed the firearm in furtherance of the drug trafficking crime." See United States v. Alverio-Meléndez, 640 F.3d 412, 419 (1st Cir. 2011) (quoting United States v. Pena, 586 F.3d 105, 112 (1st Cir. 2009)); see Bobadilla-Pagán, 747 F.3d at 35. We already determined that there was sufficient evidence to convict Mendoza

of possessing controlled substances with intent to distribute -- namely, that he committed a drug trafficking crime, see United States v. Luciano, 329 F.3d 1, 6 (1st Cir. 2003) (finding that possessing a controlled substance with intent to distribute is a drug trafficking crime) -- so the first element is satisfied. The second element is similarly met as we have concluded that the jury reasonably could infer Mendoza's constructive possession of the drugs, and the same possession analysis applies to the firearms. See United States v. Robinson, 473 F.3d 387, 398 (1st Cir. 2007) ("In order to prove possession of a firearm, the government must show actual possession or constructive possession."). Therefore, at this stage we must address whether there was sufficient evidence to prove the third element of the offense: that Mendoza possessed the firearms seized "in furtherance of" a drug trafficking crime.

"To satisfy the in-furtherance requirement, the government must establish 'a sufficient nexus between the firearm and the drug crime such that the firearm advances or promotes the drug crime.'" Rodríguez-Torres, 939 F.3d at 30 (quoting United States v. Gurka, 605 F.3d 40, 44 (1st Cir. 2010)). In assessing whether the requirement has been satisfied, we analyze the evidence "from both objective and subjective standpoints." Bobadilla-Pagán, 747 F.3d at 35. The objective factors include: "(1) the proximity of the firearm to drugs or contraband;

(2) whether the firearm was easily accessible; (3) whether the firearm was loaded; and (4) the surrounding circumstances." Id. (citing Pena, 586 F.3d at 113). "Evidence of subjective intent might include a showing that a defendant obtained a firearm to protect drugs or proceeds," but even if that evidence is lacking, "the jury may infer intent from the objective circumstances." Id.

We find that there was sufficient evidence to support Mendoza's conviction on this count too. To establish the nexus between the firearms and the drug crimes, the Government provided evidence showing that both firearms were loaded and located in close proximity to the drugs. The rifle was inside the backpack with the crack cocaine capsules, and the pistol was bound together with the heroin and cash, along with additional ammunition. Moreover, Mendoza had access to these items. The rifle was in the closet in the child's bedroom where he spent the night on more than one occasion and where he was sleeping at the time of the search. The pistol, which was in plain view, was placed on top of a cabinet and could easily be reached by standing on a chair. The Government also offered the testimony of Agent Vidal, who told the jury that firearms were "essential in drug trafficking businesses" because "they promote the continuation of the[] business to maximize earnings." And although there was no evidence that any drug transaction occurred, the jury could

rationally infer from this evidence that the firearms could be used by Mendoza to protect the activity reflected by the drugs and money. See Ayala-García, 574 F.3d at 16 (noting that "[w]hen guns and drugs are found together and a defendant has been convicted of possession with intent to distribute, the gun . . . may reasonably be considered to be possessed 'in furtherance of' an ongoing drug-trafficking crime"); Robinson, 473 F.3d at 400 (finding that evidence was sufficient to show that possession of firearms was "in furtherance of" a drug crime where firearms were hidden in an accessible place and loaded); see also id. at 399 ("[A] sufficient nexus is more readily found in cases where the firearm is in plain view and accessible to the defendant during a drug trafficking offense."). The jury was free to weigh the Government's and Mendoza's versions of the events and, considering the totality of the evidence in the light most favorable to the verdict, it reasonably found that Mendoza possessed the firearms "in furtherance of" a drug trafficking crime. Thus, his additional attempt to discredit the verdict also falls short. Accordingly, we conclude that sufficient evidence supported Mendoza's convictions on all counts.

## B. Motion to Suppress

Next, Mendoza takes aim at the district court's denial of his motion to suppress. He argues that the statements he made

to Agent Pérez and Agent del Valle should have been suppressed as involuntary because the agents did not honor his invocation of the right to remain silent. He also argues that the evidence obtained from the search of the residence should have been suppressed because the search warrant was not supported by probable cause. We spot no error by the district court and thus reject both of these challenges.

## 1. Standard of Review

We review the district court's legal conclusions in denying a motion to suppress de novo and its factual findings for clear error. United States v. González-Arias, 946 F.3d 17, 23 (1st Cir. 2019) (citing United States v. Ribeiro, 397 F.3d 43, 48 (1st Cir. 2005)). Credibility determinations and findings of fact "are susceptible to reversal only where we are definitely and firmly convinced that a mistake has been made." United States v. Oquendo-Rivas, 750 F.3d 12, 16 (1st Cir. 2014) (citing United States v. Nee, 261 F.3d 79, 84 (1st Cir. 2001)). "In reviewing the affidavit supporting an application for a search warrant, we give significant deference to the magistrate judge's initial evaluation, reversing only if we see no 'substantial basis' for concluding that probable cause existed." Ribeiro, 397 F.3d at 48 (citing United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999)).

## 2. Suppression of Mendoza's Statements

Mendoza argues that the district court erred in denying his motion to suppress the verbal and written statements that he gave to Agent Pérez and Agent del Valle because they were obtained in violation of the Fifth and Sixth Amendments to the Constitution and, thus, should have been suppressed. Specifically, Mendoza argues that he invoked his right to remain silent, but the agents did not honor it because Agent Pérez's "last chance admonishment" that Colón would be prosecuted if he did not take responsibility for the items seized forced him to make involuntary statements. In response to Mendoza's contention, the Government presses that such argument was brought too late and is not properly before us because Mendoza did not raise it in his motion to suppress or at the suppression hearing but rather in his objections to the magistrate judge's report and recommendation. Thus, the Government asks that we deem the argument waived.

We agree with the Government's position. Mendoza's motion to suppress the statements was originally grounded on a theory of coercion. Seeing that the theory was unsuccessful (the magistrate judge's report and recommendation rejected the argument and denied the motion), he asserted a new claim in his objections to the report and recommendation that his right to remain silent was violated based on the alleged coercion -- an untimely claim

-28-

that was not asserted in the motion below nor addressed by the district court. He presses this right-to-silence argument on appeal and does not attempt to show or address "good cause" for its untimeliness. Accordingly, we do not reach the merits of this claim. See United States v. Rosado-Cancel, 917 F.3d 66, 69 (1st Cir. 2019) (finding waiver where defendant "fail[ed] to raise [the argument] before the magistrate judge [and] instead advanc[ed] it for the first time in his objections to the magistrate's Report and Recommendation" (citing Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 990-91 (1st Cir. 1988))); see also United States v. Galindo-Serrano, 925 F.3d 40, 47-48 (1st Cir. 2019) ("[A]n untimely motion to suppress is deemed waived unless the party seeking to suppress can show good cause as to the delay." (quoting United States v. Sweeney, 887 F.3d 529, 534 (1st

Cir. 2018))).[19]  We therefore find no error in the denial of Mendoza's request to suppress his statements.[20]

### 3. Suppression of the Items Seized

We now turn to Mendoza's contention that the evidence seized from the search should have been suppressed because the

---

[19] To the extent Mendoza's brief could be construed to also include the initial argument he made below, the same nevertheless fails. It is well established that "coerced confession[s] [are] improper because [they are] not 'the product of a rational intellect and a free will.'"  United States v. Hufstetler, 782 F.3d 19, 21-22 (1st Cir. 2015) (quoting Lynumn v. Illinois, 372 U.S. 528, 534 (1963)). However, we have held that even "an officer's truthful description of [a] family member's predicament," without more, "is permissible since it merely constitutes an attempt to both accurately depict the situation to the suspect and to elicit more information about the family member's culpability."  Id. at 24.  Mendoza does not share a familial connection to Colón.  He was simply dating Colón's niece and thus any emotional impact caused by what happened to Colón would presumably be less than if she were a family member. Moreover, the record does not show, nor does Mendoza argue, that Agent del Valle's statement exaggerated the situation or was anything but truthful.  See id. at 24-25.  Even in cases involving a person with a closer tie to the defendant than Colón had with Mendoza here, we have taken no issue with an officer's utilization, to "both gain more information" and "to elicit more intelligence" about the individuals involved in the offense being investigated, of the fact that such person is "a suspect and unless new information came to light to discount her culpability she would continue to be criminally liable," so long as the statement is a truthful representation of the person's predicament.  See id. at 25.  In light of this, together with the fact that Mendoza was informed about his rights prior to each interview, and the agents' testimony that Mendoza appeared "calm," we cannot say that Mendoza's will was overtaken by the government's conduct.  See id. at 22.

[20] We note that the facts established in this case suggest that the PRPD acted properly in its actions and, in particular, in respecting Mendoza's person and his rights.

search warrant was overbroad and not supported by probable cause. Specifically, he asserts that the facts in the affidavit supporting the application for the warrant did not show "a reasonable suspicion . . . that the occupant had also hidden weapons or drugs inside the apartment" and thus the warrant was "improperly extended to the inside of the house." We find the argument unavailing.

The Fourth Amendment requires that search warrants be issued only upon a showing of probable cause. United States v. Rivera, 825 F.3d 59, 63 (1st Cir. 2016) (citing U.S. Const. amend. IV). Probable cause is "a 'nontechnical conception' that relies on 'common-sense conclusions about human behavior' and 'the factual and practical considerations of everyday life on which reasonable and prudent' people act." González-Arias, 946 F.3d at 22 (citing Illinois v. Gates, 462 U.S. 213, 231 (1983)). To satisfy this standard, "[a] warrant application must demonstrate probable cause to believe that (1) a crime has been committed -- the 'commission' element, and (2) enumerated evidence of the offense will be found at the place to be searched -- the so-called 'nexus' element." Ribeiro, 397 F.3d at 48 (quoting Feliz, 182 F.3d at 86). We construe Mendoza's claim as a challenge to the "nexus" element of the probable cause standard.

A magistrate judge determines if the nexus element is satisfied by making "a practical, common-sense decision whether,

-31-

given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Id. at 49 (emphasis added) (quoting Gates, 462 U.S. at 238). "'Fair probability' is another way of saying 'reasonable likelihood.'" Rivera, 825 F.3d at 63. Here, taking the facts in the light most favorable to the suppression order, as we must, see United States v. McGregor, 650 F.3d 813, 823-24 (1st Cir. 2011), we can infer that there was at least a reasonable likelihood that the stolen cars and firearms would be found in Valle's residence (or its premises).

The affidavit supporting the search warrant, prepared by Agent Marrero, narrated that an unidentified female had given a confidential report to the PRPD about a "dark-skinned individual" with short hair known by the name of Joshua (Valle) who was located at apartment C-16 at Vista de Atenas in Manatí and was in possession of two stolen Suzuki Vitara vehicles, for which the informant gave descriptions and license plate numbers. The informant had also reported that Joshua (Valle) had firearms and sold controlled substances in the town of Morovis. The affidavit indicated that Agent Marrero conducted surveillance on March 23, 2016, of the identified location and was able to corroborate the information given by the informant. The affidavit

also explained what Agent Marrero had observed: the blue Vitara with the license plate described by the informant parked at the residence, which the police confirmed as stolen. He also saw a white Vitara matching the description given by the informant arrive at the residence, driven by a "dark-skinned" individual. Agent Marrero then saw the individual exit the car and adjust around his hip what, based on his experience, he identified as a black firearm. According to the affidavit, when the individual entered residence C-16 with the firearm, Agent Marrero "los[t] sight of him." Based on this information, a state magistrate judge issued a warrant authorizing the search of the residence for the two stolen Vitaras and firearms.

We can, consistent with common sense, infer from the facts in the affidavit that there was at least a reasonable likelihood that the firearm Agent Marrero saw the individual (later identified as Valle) adjust before entering the home would be found in that residence. And the affidavit also contains evidence showing, and corroborating, that the stolen vehicles were on the residence's premises. The warrant was not solely based on the confidential informant's tip; Agent Marrero corroborated the report and personally observed the stolen vehicles parked at the residence and an individual carrying a gun into the home. See United States v. Greenburg, 410 F.3d 63, 67 (1st Cir. 2005) (noting

-33-

that where "the basis for the magistrate's probable cause finding was information provided by an unnamed informant, the affidavit must provide some information from which the magistrate can assess the informant's credibility"). Thus, it was reasonably likely that a search of the residence identified in the warrant would reveal incriminating evidence.[21] Accordingly, we conclude that the warrant was supported by probable cause. This makes it unnecessary to assess the good-faith exception, upon which the magistrate judge relied, as we may affirm on any basis supported by the record. See United States v. Rivera-Carrasquillo, 933 F.3d 33, 39-40 (1st Cir. 2019).

For these reasons, the district court did not err in denying the motion to suppress.

## C. Sentencing

### 1. Background

In preparation for sentencing, Mendoza filed a sentencing memorandum requesting a four-level minimal

---

[21] Mendoza contends that Agent Marrero had not supplied facts to infer that there would be drugs in the residence. While the warrant authorized a search for the stolen cars and firearms, the underlying affidavit provided that the informant said the individual sold drugs in Morovis, such that there would have been at least a reasonable likelihood that drugs could be found too. Nonetheless, the drugs here were found while law enforcement lawfully executed the search that was authorized by the warrant for the stolen vehicles and firearms.

participation reduction under U.S.S.G. § 3B1.2, as well as a further "reduction or variance" due to other mitigating factors, such as his age, background, and "lack of control over the premises and the household." For the firearms offense, Mendoza asked the court to impose the mandatory minimum sentence of five years. For the drug offenses, he requested a sentence of six months, for a total sentence of imprisonment of sixty-six months.

At sentencing, Mendoza reiterated his request for a minimal role adjustment. The Government objected, arguing that the evidence at trial did not provide a basis for either a reduction or a downward variance. It countered with a request for a two-level enhancement for obstruction of justice on grounds that Mendoza had perjured himself at trial, which Mendoza opposed. The court rejected Mendoza's contention that his testimony did not "den[y] any basic or clearly established facts in the case." Accordingly, it imposed the two-level obstruction of justice enhancement provided in U.S.S.G. § 3C1.1. In applying this enhancement, the court made the following findings of perjury:

> I believe Mr. Mendoza perjured himself during the trial when he denied knowing what was in the bag, which was in the closet of Mr. Valle-Colón's toddler[] son in which the Kel-Tec assault rifle and the crack vials, which were the same as [the] crack vials found in one of the vehicles outside the residence.

> I also believe that he perjured himself when he said that he wasn't permitted to walk into the kitchen or the bathroom, especially when he had stayed over

-35-

> at Mr. Valle-Colón's house on several occasions, which the Court believes is perjured testimony in an attempt to distance himself from the weapon found in the kitchen.
>
> Given the guilty verdict, that testimony were central and deliberate falsehoods.

The court likewise impliedly rejected Mendoza's request for a minimal participation adjustment by not applying any reductions.

When the enhancement was added to Counts Two and Three's (the drug offenses) base offense level of fourteen pursuant to U.S.S.G. § 2D1.1(c)(13), the total offense level resulted in sixteen.[22] This, in conjunction with Mendoza's criminal history category of I, yielded a guideline sentencing range ("GSR") of twenty-one to twenty-seven months of imprisonment for Counts Two and Three. With respect to Count One (the firearms offense), the court found that the guideline sentence was the minimum term of imprisonment required by statute, which was five years pursuant to 18 U.S.C. § 924(c)(1)(A)(i), and that the term had to run consecutively to any other term imposed. Mendoza was ultimately sentenced to seventy-two months of imprisonment for Count One[23]

---

[22] Counts Two and Three are grouped for purposes of calculating the guidelines sentencing range pursuant to U.S.S.G § 3D1.2(d), as "the offense level is determined largely on the basis of . . . the quantity of a substance involved." U.S.S.G. § 3D1.2(d).

[23] The court explained that while the statutory minimum sentence for Count One was sixty months, the offense in this case involved an "assault rifle" of "military caliber," which warranted a higher sentence, and seventy-two months was "the appropriate sentence for

and twenty-seven months of imprisonment each for Counts Two and Three.[24]  The sentences for Counts Two and Three were imposed to be served concurrently with each other but consecutively to the sentence for Count One.

On appeal, Mendoza asserts that the court imposed a procedurally unreasonable sentence because it erred in applying the enhancement for obstruction of justice under U.S.S.G. § 3C1.1 and in not addressing or granting his request for a reduction in his offense level due to his alleged minimal participation in the offense pursuant to U.S.S.G. § 3B1.2.  We address each contention in turn.

## 2.  Standard of Review

We generally review procedural reasonableness challenges under "a multifaceted abuse-of-discretion standard whereby 'we afford de novo review to the sentencing court's interpretation and application of the sentencing guidelines, assay the court's factfinding for clear error, and evaluate its judgment calls for abuse of discretion.'"  United States v. Arsenault, 833 F.3d 24, 28 (1st Cir. 2016) (quoting United States v. Ruiz-Huertas, 792

that."

[24] The court stated that it went "up to the high end" of the GSR because Mendoza had committed perjury and was therefore "more threatening to society and less deserving of leniency than a person who does not defy the trial process."

F.3d 223, 226 (1st Cir. 2015)). Where, as here, the defendant "challenges the factual predicate . . . of a sentencing enhancement, we ask only whether the court clearly erred in finding that the government proved the disputed fact by a preponderance of the evidence." United States v. Colby, 882 F.3d 267, 271 (1st Cir. 2018) (internal quotation marks omitted) (quoting United States v. Cannon, 589 F.3d 514, 517 (1st Cir. 2009)); see also United States v. Nagell, 911 F.3d 23, 29 (1st Cir. 2018) (reviewing for clear error the district court's finding of perjury underlying the imposition of an obstruction of justice enhancement). We apply the same standard when reviewing denials of sentencing reductions. See United States v. Valenzuela, 849 F.3d 477, 489 (1st Cir. 2017) (noting that the district court's decision to impose a minor participant reduction is reviewed for clear error because "[r]ole-in-the-offense determinations are notoriously fact-sensitive" (quoting United States v. Montes-Fosse, 824 F.3d 168, 172 (1st Cir. 2016))). The clear-error standard is demanding and will be satisfied only if, "upon whole-record review, an inquiring court 'form[s] a strong, unyielding belief that a mistake has been made.'" United States v. Montañez-Quiñones, 911 F.3d 59, 66 (1st Cir. 2018) (alteration in original) (quoting United States v. Cintrón-Echautegui, 604 F.3d 1, 6 (1st Cir. 2010)). Viewed under this lens, both of Mendoza's sentencing claims fail.

### 3. Enhancement for Obstruction of Justice

We first consider Mendoza's challenge to the district court's application of the enhancement for obstruction of justice. A two-level enhancement is warranted "[i]f (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to . . . the defendant's offense of conviction and any relevant conduct." U.S.S.G. § 3C1.1. Perjury is among the types of conduct which the enhancement intends to cover. Id. § 3C1.1 cmt. n.4(B); see Colby, 882 F.3d at 273. In this context, "[t]he Supreme Court has adopted the federal definition of criminal perjury[,] . . . defining it as '[giving] false testimony [under oath] concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'" Nagell, 911 F.3d at 29 (quoting United States v. Dunnigan, 507 U.S. 87, 94 (1993)); see also U.S.S.G. § 3C1.1 cmt. n.2 (noting that the enhancement does not apply when the defendant's false testimony is not "a willful attempt to obstruct justice" because it results from "confusion, mistake, or faulty memory"). Therefore, the enhancement does not punish a defendant for exercising his constitutional right to

testify; it punishes him only if he "commits perjury in the process." Nagell, 911 F.3d at 29-30 (quoting United States v. Mercer, 834 F.3d 39, 48 (1st Cir. 2016)).

To impose the enhancement, the sentencing court "must make factual findings that 'encompass all the elements of perjury -- falsity, materiality, and willfulness.'" Colby, 882 F.3d at 273 (quoting United States v. Matiz, 14 F.3d 79, 84 (1st Cir. 1994)). But this does not mean that the court has to "address each element of perjury in a separate and clear finding." Id. (quoting Matiz, 14 F.3d at 84). "Rather, we examine whether 'a sentencing court's findings encompass all of the factual predicates for a finding of perjury.'" Id. (quoting Matiz, 14 F.3d at 84).

In making a finding of falsity, the court is not limited to directly contradictory testimony; it may also rely on "a solid foundation of circumstantial evidence." Nagell, 911 F.3d at 30 (quoting United States v. Akitoye, 923 F.2d 221, 229 (1st Cir. 1991)). Because the sentencing judge below also presided over the trial, "we must allow him reasonable latitude for credibility assessments." Id. (quoting United States v. Shinderman, 515 F.3d 5, 19 (1st Cir. 2008)). The court must also find materiality, which Application Note 6 defines as "evidence, fact, statement, or information that, if believed, would tend to influence or affect

the issue under determination." U.S.S.G. § 3C1.1 cmt. n.6. "The materiality of a false statement is inferable from the entirety of the record and the issues at stake at trial." Nagell, 911 F.3d at 30. Lastly, the third factual predicate -- willfulness -- can be inferred from sufficient materiality. Id.

Here, in concluding that the enhancement applied, the court found that Mendoza perjured himself in two instances. First, when he denied knowing what was inside the backpack found in the room where he was found sleeping. That bag contained a loaded rifle and capsules filled with crack cocaine that were identical to those found in the trunk of one of the stolen vehicles parked outside the residence, next to a pair of Mendoza's sneakers. Second, the court found that he committed perjury when he said "he wasn't permitted to walk into the kitchen or the bathroom, especially when he had stayed over at [Valle's] house on several occasions," which the court "believe[d] [was] perjured testimony in an attempt to distance himself from the weapon found in the kitchen." The court further found that the statements it identified constituted "central and deliberate falsehoods."

Mendoza contends that the district court did not make the required "clear finding" that his testimony was "willfully false aside from the jury's rejection of his defense." He maintains that there was "no definite evidence" that the backpack

belonged to him, that he knew that it was hidden in the closet in the room where he was sleeping, or that he was involved in drug trafficking. Mendoza further argues that his testimony denying having any knowledge of the items seized was not material because the jury could have rejected his defense simply because of his association with Valle and the fact that the firearms and drugs were in Valle's home, where Mendoza was staying, and not because the jury actually thought Mendoza knew that those items were hidden in the home.

We find Mendoza's contentions unavailing. As we have explained, the district court was not required to "address each element of perjury in a separate and clear finding," as long as its findings "encompass[ed] all of the factual predicates for a finding of perjury." Colby, 882 F.3d at 273 (quoting Matiz, 14 F.3d at 84). We begin with the district court's findings that Mendoza "perjured himself when he said that he wasn't permitted to walk into the kitchen or the bathroom" and that such testimony was a "central and deliberate falsehood." These findings are supported by the record and encompass each of the elements of perjury. The district court explicitly found that the testimony was false, aptly noting that Mendoza's assertion was contradicted by the fact that Mendoza "had stayed over at [Valle's] house on several occasions." We have no basis for concluding that this

-42-

finding was clearly erroneous; the court could have reasonably found support in the record. Mendoza testified that he stayed at Valle and Colón's home several times and that he was in a relationship with Colón's niece, with whom he would sleep in the child's room, which was located "right in front of the kitchen." He also testified that he knew Valle and Colón for at least five or six years, that he had become closer to Valle in the four to five months leading to the arrest, and that while he did not feel as "comfortable as in [his own] house," he felt "normal" in Valle and Colón's house. Keeping in mind that "the district court is the primary arbiter of witness credibility" in this context, United States v. Reynoso, 336 F.3d 46, 50 (1st Cir. 2003), based on the evidence, the district court reasonably could have found Mendoza's testimony to be false. See United States v. Guzmán-Batista, 783 F.3d 930, 938 (1st Cir. 2015) ("[A] district court's choice between two plausible competing interpretations of the facts cannot be clearly erroneous." (quoting United States v. Henderson, 463 F.3d 27, 32 (1st Cir. 2006))). We also note that Mendoza does not target this finding of falsity in his briefing, instead directing his efforts at the court's finding that he lied when he denied having knowledge of the contents of the backpack, and so Mendoza cannot challenge the underlying finding now. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

Further, the court explicitly found that the testimony was willful and material when it noted its belief that Mendoza testified falsely to "distance himself from the weapon found in the kitchen." Mendoza's statement was clearly material to his defense strategy because he was "attemp[ing] to negate having a mens rea of 'knowingly,' which was an element of the crime" and "[i]f the jury believed him, his statement[] could have changed the outcome of the case." See Nagell, 911 F.3d at 31. Moreover, Mendoza does not argue that his statement was a result of "confusion, mistake, or faulty memory," see U.S.S.G. § 3C1.1 cmt. n.2, and "[t]he nature of the material falsehood in this case is not one in which the willfulness of the falsehood could reasonably be questioned," Mercer, 834 F.3d at 49.

We thus conclude that the court made factual findings that encompassed the three elements of perjury, and we cannot say that the court erred, let alone clearly erred, in finding that Mendoza committed perjury when he stated that he was not allowed to walk into the kitchen or bathroom. Accordingly, the court committed no error in imposing the two-level enhancement for obstruction of justice. Because "[a] single finding of perjury is sufficient to uphold the lower court's sentencing enhancement for obstruction of justice," Nagell, 911 F.3d at 30 (citing United States v. D'Andrea, 107 F.3d 949, 959 (1st Cir. 1997)), it is

-44-

unnecessary to discuss the court's additional finding of perjury related to the contents of the backpack.

### 4. Mitigating Role Adjustment

We now turn to Mendoza's claim that the district court erred in failing to consider and grant him a reduction for his alleged minimal role in the offense. Section 3B1.2 of the Sentencing Guidelines allows a court to decrease the offense level of a defendant who was a minimal participant in the criminal activity for which he is being held accountable by four levels, and the offense level of a defendant who was a minor participant by two levels.[25] U.S.S.G. § 3B1.2(a), (b). Adjustments under this section apply to defendants whose role in the offense make them "substantially less culpable than the average participant in the criminal activity" in which they were involved. U.S.S.G. § 3B1.2 cmt. n.3(A). Among this pool of defendants eligible for an adjustment, a defendant "who plays a minimal role in the criminal activity" -- that is, one "who [is] plainly among the least culpable of those involved in the conduct of a group" -- is considered a minimal participant. U.S.S.G. § 3B1.2 cmt. n.4. A minor participant, on the other hand, is a defendant who is

---

[25] A defendant who was neither a minimal nor a minor participant but whose participation falls in between may be considered for a three-level reduction. See U.S.S.G § 3B1.2.

substantially "less culpable than most other participants in the criminal activity, but whose role could not be described as minimal."  U.S.S.G. § 3B1.2 cmt. n.5; see United States v. Arias-Mercedes, 901 F.3d 1, 5-6 (1st Cir. 2018).  In this context, "participant" means "a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.2 cmt. n.1; § 3B1.1 cmt. n.1.

The defendant seeking the mitigating role adjustment "bears the burden of proving, by a preponderance of the evidence, that he is entitled to the downward adjustment." Arias-Mercedes, 901 F.3d at 5 (quoting United States v. Pérez, 819 F.3d 541, 545 (1st Cir. 2016)).  We have cautioned that "[b]ecause determining one's role in an offense is a fact-specific inquiry, 'we rarely reverse a district court's decision regarding whether to apply a [mitigating] role adjustment.'"  United States v. De la Cruz-Gutiérrez, 881 F.3d 221, 225-26 (1st Cir. 2018) (quoting United States v. Bravo, 489 F.3d 1, 11 (1st Cir. 2007)).  Thus, "[a] defendant will 'only prevail on appeal by demonstrating that the district court's determination as to his role in the offense was clearly erroneous.'"  Id. at 226 (quoting United States v. González-Soberal, 109 F.3d 64, 74 (1st Cir. 1997)).

Mendoza alleges that the district court erred in denying a mitigating role adjustment because it failed to accurately

-46-

determine his role in the offense by considering all the relevant circumstances and facts, which, according to Mendoza, establish that his role was "clearly peripheral." He contends that it was Valle who was in control of the residence and the stolen vehicles, and that there is no evidence that he (Mendoza) participated in drug transactions or that he was responsible for the decision to use the residence as a stash house for stolen vehicles, weapons, and drugs.

We reject Mendoza's argument, but first we acknowledge that the record does not provide, at least explicitly, the court's factual basis for its determination of Mendoza's role. At sentencing, the court did not explain why it was denying Mendoza's request for a minimal participation reduction, nor did it make any findings of fact as to his role in the offense. Instead, the court heard the parties' arguments regarding the minimal participation reduction and in pronouncing the sentence it imposed the obstruction of justice enhancement but not the reduction, stating that "no other guideline adjustments are applied." Nevertheless, we have held in other sentencing contexts that the district court need not tick through every factor in coming to its decision. See United States v. Dixon, 449 F.3d 194, 205 (1st Cir. 2006) (finding court not required to address § 3355(a) factors one by one). We have also recognized that "a court's reasoning can

often be inferred by comparing what was argued by the parties" to what the court did.  United States v. Rivera-Clemente, 813 F.3d 43, 50 (1st Cir. 2016) (quoting United States v. Ocasio-Cancel, 727 F.3d 85, 91 (1st Cir. 2013)).  At sentencing, the Government argued against the minimal participant reduction, stating that Mendoza had an "equal participation" in the offense, access to the stolen vehicles -- in one of which an item that belonged to Mendoza was found -- and that he "had the most dangerous weapon of the two."  The Government also averred that Mendoza had admitted to possessing the firearms and the drugs with Valle.  Although the court did not state so explicitly, we can infer that it sided with the Government's arguments and therefore decided not to apply the reduction.

In any event, Mendoza failed to meet his burden of proving that he was entitled to the minimal participation reduction.  See Arias-Mercedes, 901 F.3d at 5.  In his sentencing memorandum, Mendoza argued that he was not the owner of the residence and that it was Valle who was in possession of the two stolen vehicles and who was observed in possession of firearms and depicted as a drug dealer.  He further pressed that "his probable participation could only have been as a helping hand or aide" and that he admitted to joint possession with Valle "only after he was confronted with the possibility that if [someone] did not admit to

-48-

it, [Colón] could also be prosecuted." On appeal, he re-emphasizes that he did not exert control over the residence or the stolen vehicles and that he did not make the decision to use the residence as a stash house. However, "the fact that someone else[, here, Valle,] might have been more culpable than [Mendoza] does not necessarily mean that [Mendoza's] participation was minor [or minimal]." De la Cruz-Gutiérrez, 881 F.3d at 226. Mendoza had to show that "he was [substantially] less culpable than" Valle. Id. (emphasis in original); see Arias-Mercedes, 901 F.3d at 8. His statement admitting co-ownership with Valle, however, puts the two on equal footing. See De la Cruz-Gutiérrez, 881 F.3d at 226-27 (an admission that another individual performed a role that was substantially similar defeats the claim for a minor role reduction). Moreover, Mendoza overlooks his testimony that he had stayed at Valle's house several times, as well as the fact that the jury found him guilty of possessing the firearms and drugs, and the evidence supported an inference that Mendoza had access to the stolen cars because his sneakers were found in one of the cars' trunks, along with empty vials that were identical to those found inside of the backpack located in the room where he was found sleeping at the time of the search, and which he used on the occasions he stayed at the residence. There is sufficient evidence in the record from which the court reasonably could have

found that Mendoza was not substantially less culpable than Valle. Accordingly, it was not clearly erroneous for the court to refuse to apply the mitigating role adjustment, even if it did so implicitly.

Having rejected both of Mendoza's sentencing challenges, we uphold Mendoza's sentence.

## III.  Conclusion

In sum, the record reflects that the evidence of Mendoza's guilt was more than sufficient to support the jury's verdict and that the district court did not err in denying his motion to suppress the statements he provided to law enforcement or the evidence seized from the residence.  It further shows that the court did not clearly err in imposing the sentencing enhancement for obstruction of justice because Mendoza perjured himself, or in rejecting his request for a reduction in his offense level based on his purported minimal participation in the offenses. Accordingly, we affirm Mendoza's convictions and sentence.

**Affirmed.**